## ACCESS AND FUNDING AGREEMENT

This Access and Funding Agreement ("Agreement" or "Contract") is made this _____ day of March 2020, between:

1031 Canal Development, LLC, a Louisiana Limited Liability company, with a principal office address of 3525 N. Causeway Blvd., Suite 1040, Metairie, Louisiana 70002 ("1031 Owner");

1025 Canal Street LLC, a Louisiana Limited Liability company, with a principal office address of 3525 N. Causeway Blvd., Suite 1040, Metairie, Louisiana 70002 ("1025 Owner");

Canaux LLC, a Louisiana Limited Liability company, with a principal office address of 3525 N. Causeway Blvd., Suite 1040, Metairie, Louisiana 70002 ("Canaux"); and

D. H Griffin Wrecking Company, Inc., a corporation organized and existing under the laws of the State of North Carolina, with a principal office address of 4716 Hilltop Road, Greensboro, North Carolina ("Contractor").

## RECITALS

Whereas, 1031 Owner is the owner and developer of a project for the construction of a Hard Rock Hotel located at 1031 Canal Street, New Orleans, Louisiana ("Hard Rock Hotel");

Whereas, 1025 Owner is the owner of certain real property bearing the municipal addresses 1019 and 1025 Canal Street, New Orleans, Louisiana;

Whereas, Canaux is the owner of certain real property bearing the municipal address 1027 Canal Street, New Orleans, Louisiana;

Whereas, on Saturday, October 12, 2019, the Hard Rock Hotel being constructed partially collapsed, causing the death of three people, two of whom remain trapped in the structure;

Whereas, 1031 Owner desires the demolition of the Hard Rock Hotel by Contractor to avert possible further collapse and the attendant danger to life and property;

Whereas, the demolition of the Hard Rock Hotel requires the demolition of certain adjacent properties, specifically 1019/1025 Canal Street, 1027 Canal Street, and 1022 Iberville Street (collectively and individually the "Red Zone Buildings");

Whereas, 1025 Owner and Canaux are willing to permit the demolition of the real property they respectively own;

Whereas, Contractor and the State of Louisiana have entered into an Emergency Public Works Agreement dated March _____, 2020 ("EPWA");

{N3953040.8}

1

EXHIBIT

**1**

NOW THEREFORE, in consideration of the mutual promises and obligations herein, 1031 Owner, 1025 Owner, Canaux, and Contractor hereby agree as follows:

1.    OWNER AGREEMENTS TO DEMOLITION:

    (a)    1031 Owner hereby agrees to and authorizes the demolition of the Hard Rock Hotel by Contractor, pursuant to the EPWA.

    (b)    1025 Owner hereby agrees to the demolition of the improvements constructed on the real property bearing the municipal addresses 1019 and 1025 Canal Street, New Orleans, Louisiana, and authorizes the demolition of those improvements by Contractor, pursuant to the EPWA.

    (c)    Canaux hereby agrees to the demolition of the improvements constructed on the real property bearing the municipal address 1027 Canal Street, New Orleans, Louisiana, and authorizes the demolition of those improvements by Contractor, pursuant to the EPWA.

2.    WORK:

    (a)    Except as specified elsewhere in this Agreement, Contractor shall furnish all labor, materials, tools, supplies, equipment, transportation, supervision, technical, professional, and other services, and shall perform all operations necessary or required, to satisfactorily complete the Scope of Work described in Exhibit B to the EPWA.

    (b)    "Extra Work" means work or services not required to fulfill Contractor's obligations under EPWA Scope of Work, Exhibit B, including, but not limited to, the Exclusions set forth in Exhibit B.  Contractor will not perform Extra Work without the prior written approval of 1031 Owner.  Approved Extra Work shall be compensated on a Time and Material basis according to the rates set forth in Exhibit E to the EPWA.  To the extent subcontractors are engaged by Contractor to perform Extra Work, such work will be billed at cost, without Contractor mark-up.

    (c)    Contractor has visited the Site, become generally familiar with local conditions under which the Work is to be performed, and correlated personal observations with requirements of this Contract.  Contractor agrees that concealed and/or unknown physical conditions shall not constitute grounds for modification of the Contract Price.

    (d)    Contractor shall assist the owners of the Red Zone Buildings in obtaining the necessary municipal approvals to demolish the Red Zone Buildings.  Such approvals are a condition precedent to the performance of the Scope of Work.

    (e)    Contractor shall make reasonable efforts to preserve the foundation and foundation slab of Hard Rock Hotel, but does not guarantee or warrant against damage to these building components during the demolition of the Hard Rock Hotel and 1031 Owner hereby waives, releases, and covenants not to sue Contractor for any damage

{N3953040.8}

2

to those building components arising from the Scope of Work unless Contractor fails to make reasonable efforts to preserve them.

(f)     Prior to the commencement of the Scope of Work, the owners of the Red Zone Buildings, at their sole expense, will survey for, and remediate any Hazardous Substances at their respective properties.

3.     CONTRACT PRICE:

(a)     As full consideration for Contractor's performance of this Agreement, 1031 Owner shall pay Contractor the sum of Sixteen Million Three Hundred Eighty-one Thousand Seven Hundred Forty and No/100 Dollars ($16,381,740.00)

(b)     The Contract Price includes all federal, state, and local taxes, including any sales, consumer, and use taxes required by applicable Laws and Regulations.

(c)     As set forth in Ex. A to the EPWA, the Contract Price shall not be subject to adjustment due to any change in the cost of labor, material, fuel, equipment, or any other cost or circumstance, regardless of whether such change was reasonably foreseeable at the time of contracting.

(d)     The Contract Price includes the removal and disposal of any demolished building components, materials, equipment, rubbish, or debris from the Site ("Demolished Materials").  Contractor shall have salvage rights to all Demolished Materials resulting from the demolition of the Red Zone Buildings and Hard Rock Hotel.

(e)     The Contract Price is the total price for the turnkey demolition (labor, materials, equipment, engineering, site preparation, etc.) of the Hard Rock Hotel and the Red Zone Buildings but does not include Extra Work as defined above.

(f)     The Contract Price shall be placed into escrow as set forth in Exhibits 1 and 2.

4.     CONTRACT TIME:

(a)     Contractor shall commence performance as provided in the EPWA.

(b)     Contractor shall diligently pursue the performance of the Work and achieve completion within the Contract Time.

(c)     Contractor expects to achieve Final Completion of the Scope of Work not later than one hundred twenty-five (125) days following commencement, provided, however, that any delays not due to the fault of Contractor or persons for whom Contractor is responsible shall cause the Final Completion date to be extended.

5.     PAYMENT:

(a)     The Contract Price is to be paid as set forth in Exhibit 1, attached.

6.    INSURANCE AND INDEMNITY:

(a)    Contractor shall procure insurance as provided in Section 13 of Exhibit A to the EPWA. The parties agree that Contractor's obligation under Section 13 of Exhibit A to the EPWA shall only require insurance coverage to the extent permitted by Louisiana Revised Statutes §9:2780.1(I).

(b)    To the fullest extent permitted by law, Contractor shall defend, indemnify, and hold harmless the Owner Indemnitees against claims, damages, losses, and expenses, including, but not limited to, attorneys' fees and expenses, arising out of or resulting from performance of the Scope of Work, provided that such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Scope of Work itself), but only to the extent caused in whole or in part by the negligent acts or omissions of the Contractor and its subcontractors, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable.

(c)    Contractor's indemnity obligations in Section 6(b) above are expressly limited to the amount of the proceeds payable under the insurance policy or policies that Contractor is required to obtain under Section 13 of Exhibit A to the EPWA. Contractor acknowledges that the cost of the insurance required under Section 13 of Exhibit A to the EPWA has been recovered by Contractor in the Contract Price.

(d)    It is the intent of 1031 Owner and Contractor that this Article 6 conform to the requirements of Louisiana Revised Statutes §9:2780.1.  In the event that an arbitration panel determines that this Article 6 violates said statute, this Article 6 shall be reformed to the extent necessary to comply with the statute.

7.    NOTICES:

(a)    Any notice required or otherwise given pursuant to this Contract shall be in writing and shall be transmitted by facsimile, certified mail return receipt requested and postage prepaid, or hand delivered to the other party's representative listed below:

| Party: | Representative: |
|---|---|
| 1031 Owner | Chandra M. Kailas<br>Manager<br>3525 N. Causeway Blvd<br>Suite 1040<br>Metairie, LA 70002 |
| 1025 Owner | Chandra M. Kailas<br>Manager<br>3525 N. Causeway Blvd<br>Suite 1040<br>Metairie, LA 70002 |

{N3953040.8}

4

| Canaux | Chandra M. Kailas<br>Manager<br>3525 N. Causeway Blvd<br>Suite 1040<br>Metairie, LA 70002 |
|---|---|
| Contractor | David H. Griffin, Jr.<br>President<br>D. H. Griffin Wrecking Company, Inc.<br>4716 Hilltop Road<br>Greensboro, NC 27407<br><br>and<br><br>Larry Gillen, Esq.<br>General Counsel<br>D. H. Griffin Wrecking Company, Inc.<br>4716 Hilltop Road<br>Greensboro, NC 27407 |

8.    DISPUTES:

    (a)    The parties will endeavor to resolve any Claim through good faith negotiation.

    (b)    Any Claim not resolved by negotiation, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association ("AAA") in effect as of the date of filing, unless the parties mutually agree otherwise. A demand for arbitration shall be made in writing, delivered to the other party to the Agreement, and filed with AAA. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded. A demand for arbitration shall be made within the time limits specified by applicable Laws and Regulations and in no event shall it be made after the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable prescriptive period (statute of limitations) or preemptive period (statute of repose).

    (c)    The location of the arbitration shall be New Orleans, Louisiana, unless the parties otherwise mutually agree in writing.

    (d)    The award of the arbitrator(s) shall be final and binding upon the parties without the right of appeal to the courts. Judgment may be entered upon it in accordance with applicable Legal Requirements by any court having jurisdiction thereof.

    (e)    The interpretation of this Contract and any Claims shall be governed by the laws of the State of Louisiana, without regard to its conflict of laws provisions.

{N3953040.8}

9.   REMEDIES:

    (a)   Duties and obligations imposed by the Contract and rights and remedies available thereunder shall be in addition to, and not a limitation of, duties, obligations, rights, and remedies otherwise imposed or available by law.

    (b)   No action or failure to act by a party shall constitute a waiver of any rights or duties afforded it under the Contract, nor shall such action or failure to act constitute approval of, or acquiescence in, a breach of this Contract, except as the parties may specifically agree in writing.

10.   GENERAL:

    (a)   Contractor shall procure for 1031 Owner a license to use the instruments of service of Thorton Thomasetti, Inc. ("TTI"), on the same terms and conditions as TTI's license to Contractor.  Where possible, these instruments of service will be provided to 1031 Owner in native format.

    (b)   1031 Owner acknowledges and agrees to Contractor engaging TTI and Controlled Demolition, Inc. ("CDI") as subcontractors for the Scope of Work.

    (c)   Contractor shall endeavor to include 1031 Owner on all direct communications between the Demolition Team and any government, municipal, quasi-governmental, state, or city authority.

    (d)   Without 1031 Owner's written consent, the Demolition Team shall not enter into any agreement with any party other than 1031 Owner to perform work or services related to the Hard Rock Hotel or Red Zone Buildings; provided, however, 1031 Owner acknowledges and approves of TTI's current engagement by Lafarge Concrete to conduct forensic analysis on concrete material used in the construction of the Hard Rock Hotel.

    (e)   The partial or complete invalidity of any one or more Articles of this Contract shall not affect the validity, enforceability, or effect of that Article or any other Article.

    (f)   Unless otherwise expressly defined in the Contract, words which have well-known technical or construction industry meanings are used in accordance with such recognized meanings.

    (g)   Titles, captions, and numbering used in this Contract are for convenience only and shall not be used in the interpretation of any provision of this Contract.

    (h)   Neither 1031 Owner, 1025 Owner, Canaux, nor Contractor shall be deemed to be the drafter or author of this Contract for purposes of construing and interpreting this Contract in any context.

    (i)   The enforceability of this Agreement is expressly conditioned upon (a) written approval from Berkshire Hathaway; (b) review and acceptance of Contractor's

{N3953040.8}

6

insurers; and (c) all necessary government approvals for the work contemplated in the EPWA.

(j)     This agreement may be executed in counterparts.

11.     DEFINITIONS:

(a)     A "Claim" is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, adjustment of the Contract Price, adjustment of the Contract Time, or other relief with respect to the requirements of the Contract Documents, including the terms of this Contract. The term "Claim" also includes any other disputes and matters in question between the Owner and Contractor arising out of or relating to the Scope of Work or the parties' relationship. The responsibility to substantiate Claims shall rest with the party making the Claim.

(b)     The term "day" as used in this Contract shall mean calendar day unless otherwise specifically defined.

(c)     "Demolition Team" means Contractor and its subcontractors, CDI and TTI.

(d)     "Force Majeure" means an event or occurrence that (1) is beyond the control of the party claiming Force Majeure; (2) did not result from the fault or negligence of the party claiming Force Majeure; and (3) could not be avoided or overcome through the exercise of due diligence, including, without limitation, acts of God or of a public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, lockouts, or boycotts of regional or national origin not directed solely at Contractor, nationwide material or labor shortages, embargos, and, unusually severe weather; provided, however, that default by a person employed or engaged by Contractor to perform a portion of Contractor's Work that is not the result of a Force Majeure as defined herein shall not constitute a Force Majeure.

(e)     "Hazardous Substance" means any substance or material: (1) the presence of which requires management, reporting, investigation, or remediation under any applicable Laws and Regulations; (2) which is or becomes regulated by any federal, state or local governmental authority, including without limitation, any substance or waste material which is defined or listed as a "hazardous waste," "acutely hazardous waste," "extremely hazardous substance," "restricted hazardous waste," "industrial waste," "hazardous substance," "hazardous material," "pollutant," "hazardous air pollutant," "criteria pollutant," "volatile organic compound," "priority pollutant," "special waste," "SARA 313 chemical," or "contaminant" under any applicable Laws and Regulations, including without limitation, the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C §§ 9601, *et seq*., the federal Resource Conservation and Recovery Act, 42 U.S.C. §§690l *et seq*., the federal Water Pollution Control Act, 33 U.S.C. §§1251 *et seq*., the federal Clean Air Act, 42 U.S.C. §§7401 *et seq*., the Toxic Substances Control Act, 7 U.S.C. §§136 *et seq*., the Safe Drinking Water Act, 42 U.S.C. §§300f *et seq*., the

Occupation Safety and Health Act of 1970, 29 U.S.C. §§651 *et seq.*, and similar Louisiana state and local laws regulating or otherwise affecting the handling, use, control, management, treatment, storage, or disposal of hazardous, explosive, corrosive, flammable, infectious, radioactive, or toxic materials or wastes; (3) which contains gasoline, diesel fuel, or other petroleum hydrocarbons or a petroleum derivative; (4) which contains polychlorinated biphenyls ("PCBs"), asbestos, or urea formaldehyde; or (5) which poses an unreasonable risk of injury to human health or the environment.

(f)     "Laws and Regulations" means all federal, state, and local codes, laws, ordinances, rules, and statutes; all permit or license requirements; all approvals, authorizations, decrees, judgments, orders, rulings, regulations, or decisions of any federal, state, or local governmental bodies having jurisdiction over the parties to the Contract, the Work, or the Site(s) where Work is being performed; and, all decrees, decisions, judgments, orders, or rulings by any federal, state, or local court having jurisdiction over the parties to the Contract, the Work, or the Site(s) where Work is being performed.

(g)     "Owner Indemnitees" means 1031 Owner, 1025 Owner, and Canaux, and the agents, officers, directors, managers, members, shareholders, employees, and representatives of any of them.

(h)     "Person" means any natural or juridical person as defined by La. Civil Code Art. 24, including, but not limited to, corporations, partnerships, joint ventures, and any other business association or organization.

(i)     "Project" means the demolition of the Hard Rock Hotel and the Red Zone Buildings as provided in the EPWA

(j)     "Site" means the real property bearing the municipal addresses 1031 Canal Street, 1019/1025 Canal Street, 1027 Canal Street, and 1022 Iberville Street, New Orleans, Louisiana, both collectively and individually, the legal descriptions of which are set forth in Exhibit F to the EPWA.

(k)     Any capitalized term not defined in this Agreement shall have the meaning ascribed to it in the EPWA.

**[SIGNATURE BLOCKS APPEAR ON THE FOLLOWING PAGE]**

{N3953040.8}

8

1031 Canal Development, LLC

By: _Chandra M. Eailus_____

Its: _Manager_____

1025 Canal Street LLC

By: _Chandra M. Eailus_____

Its: _Manager_____

Canaux LLC

By: _Chandra M. Eailus_____

Its _Manager_____

D. H Griffin Wrecking Company, Inc.

By: _____

Its _____

**EXHIBIT 1 TO ACCESS AND FUNDING AGREEMENT**

**ESCROW AND PAYMENT SCHEDULE**

1.      Mobilization Payment.  No later than the close of business on the day following the execution of the Emergency Public Works Agreement ("EPWA") or the execution of this Access and Funding Agreement ("AFA"), whichever is later, 1031 Owner  shall cause the sum of Four Million and No/100 Dollars ($4,000,000.00) to be sent to Contractor via wire transfer to the following account:

    BB&T
    3318 W. Friendly Avenue
    Greensboro, NC  27410
    Routing No.: 053101121
    Account No.: 5195099733

2.      Appointment of Escrow Agent.  1031 Owner, and Contractor agree to the appointment of First Bank & Trust as the escrow agent ("Escrow Agent") for the balance of the Contract Price under the EPWA (the "Escrow Amount").

3.      Delivery of Escrow Amount.  No later than the close of business on the day following the execution of the EPWA or the execution of this AFA, whichever is later, 1031 Owner shall cause the sum of Eleven Million Six Hundred Fifty Thousand and No/100 Dollars ($11,650,000.00) (the "Initial Escrow Amount") to be delivered to the Escrow Agent. Thereafter, promptly upon approval by the builder's risk insurers of additional insurance proceeds related to the demolition and receipt of such proceeds by 1031 Owner up to the amount of Seven Hundred Thirty One Thousand Seven Hundred Forty and No/100 Dollars ($731,740.00) (the "Second Escrow Amount") (the Initial Escrow Amount and the Second Escrow Amount are hereinafter referred to as the "Escrow Amount"), 1031 Owner shall the Second Escrow Amount to be delivered to the Escrow Agent.

4.      Disbursement of Escrow Amount.  Subject to the terms and conditions set forth below, the Escrow Agent shall disburse the Escrow Amount to the Contractor according to the following schedule:

| Event | | Payment |
|---|---|---|
| Implosion | | 4,000,000 |
| Week 1 | | 500,000 |
| Week 2 | | 500,000 |
| Week 3 | | 500,000 |
| Week 4 | | 500,000 |
| Week 5 | | 500,000 |
| Week 6 | | 500,000 |
| Week 7 | 500,000 | |
| Week 8 | | 500,000 |

| | | |
|---|---|---|
| Week 9 | | 438,174 |
| Week 10 | | 438,174 |
| Week 11 | | 438,174352,885 |
| Week 12 | | 438,174352,885 |
| Week 13 | | 438,174352,885 |
| Week 14<br>Week 15 | | 438,174352,885 |
| Week 15 | | 438,174352,885 |
| Week 16 | | 438,174352,885 |
| Week 17 | | 438,174352,885 |
| Completion | | 438,174 |
| | | |
| Total | | $12,381,740 |

(a)   Progress Payments (Pay Apps 1 - 17) shall be paid in accordance with the following procedure:

(i)   Contractor will submit an application for payment to 1031 Owner by 5:00 pm CST on Wednesday each week.

(ii)   If a payment application is received by the above-stated Wednesday deadline, 1031 Owner will act upon the application by 5:00 pm CST the following day (Thursday), either approving or denying the application. In the event that 1031 Owner denies any application, 1031 Owner shall provide Contractor a detailed written explanation for such denial. The failure of 1031 Owner to act by the Thursday deadline shall be deemed a constructive approval of the pending pay application.

(iii)   The Escrow Agent shall authorize payment to Contractor by wire transfer no later than 12:00 pm CST on the day following 1031 Owner approval (whether direct or constructive).

(iv)   If an application for payment is not received by the above-stated Wednesday deadline, then the approval and payment deadlines will run from the day when the application for payment is submitted to 1031 Owner.

(b)   The Implosion Milestone payment shall be paid in accordance with the following procedure:

(i)   Following the demolition of the Hard Rock Building by controlled demolition using explosive charges, Contractor will submit an application for payment to 1031 Owner accompanied by Contractor's confirmation that either: 1) all the explosive charges in the Hard Rock Building have fully detonated; or, 2) all explosive charges that have not fully detonated have either been removed from the Hard Rock Building or otherwise deemed rendered safe by 1031 Owner's engineer.

  (ii) 1031 Owner will act upon the application for payment by 5:00 pm CST on the third day following receipt, either approving or denying the application. In the event that 1031 Owner denies the Implosion Milestone application, 1031 Owner shall provide Contractor a detailed written explanation for such denial.  The failure of 1031 Owner to act by the deadline shall be deemed a constructive approval of the pending pay application.

  (iii) The Escrow Agent shall pay the approved application for payment to Contractor by wire transfer no later than 12:00 pm CST on the day following 1031 Owner approval (whether direct or constructive).

 (c) The Final payment shall be paid in accordance with the following procedure:

  (i) Contractor will submit an application for payment to 1031 Owner accompanied by Contractor's confirmation that Contractor has achieved Completion as defined in the Emergency Public Works Agreement.

  (ii) 1031 Owner will act upon the application for payment by 5:00 pm CST on the third day following receipt, either approving or denying the application. In the event that 1031 Owner denies the Final payment application, 1031 Owner shall provide Contractor a detailed written explanation for such denial.  The failure of 1031 Owner to act by the deadline shall be deemed a constructive approval of the pending pay application.

  (iii) The Escrow Agent shall pay the approved application for payment to Contractor by wire transfer no later than 12:00 pm CST on the day following 1031 Owner approval (whether direct or constructive).

 (d) In the event any payment is not received when due, Contractor may cease Work until the payment is received.

5. Extra Work shall be billed separately, with payment due seven (7) days following invoicing.  Extra work shall be billed on a Time and Material basis.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**EXHIBIT 2 TO ACCESS AND FUNDING AGREEMENT**

**ESCROW AGREEMENT**

1.     Definitions.   Unless otherwise defined in this Exhibit 2 (the "Escrow Agreement),
capitalized terms used in this Exhibit 2 shall have the meanings given to them in the Access
and Funding Agreement.  The following capitalized terms used in this Escrow Agreement
have the respective meanings set forth below:

    (a)     "Court Order" shall mean a final, non-appealable order in a case commenced in any
court of competent jurisdiction, in which Contractor and 1031 Owner are parties.

    (b)     "Escrow Account" shall have the meaning given it in Section 2 below.

    (c)     "Escrow Funds" shall mean the Escrow Amount held by the Escrow Agent, and all
interest accrued thereon, taking into account the amounts of any disbursements
made pursuant to Section 4 below.

    (d)     "Escrow Termination Date" shall mean the earlier of (i) the date of disbursement
of all of the Escrow Funds in accordance with the terms of this Escrow Agreement,
leaving a zero balance in the Escrow Account or (ii) the date on which the Escrow
Agent receives a Joint Direction/Notice to terminate the Escrow Account.

2.     Advance Payments in Escrow.  1031 Owner shall make, or cause to be made, the delivery
of the Escrow Amount for deposit into escrow with the Escrow Agent by wire transfer
pursuant to the following wire transfer instructions:

    [insert wire instructions]

The Escrow Amount shall be held by the Escrow Agent in one or more of Escrow Agent's
escrow accounts (the "Escrow Account") and administered and distributed in accordance
with the terms and conditions of this Escrow Agreement.

3.     No Liens or Encumbrances on Escrow Funds. Except as set forth in this Escrow
Agreement, neither Contractor nor 1031 Owner shall encumber the Escrow Funds in any
manner whatsoever.

4.     Disbursement of the Escrow Funds.  The Escrow Agent shall disburse the Escrow Funds
in the manner described in this Section 4.  Prior to the Escrow Termination Date, the
Escrow Agent shall disburse the Escrow Funds as provided per one of the following:

    (a)     As provided in Section 4 of Exhibit 1.

    (b)     As directed by Contractor and 1031 Owner in writing to the Escrow Agent sent
jointly by Contractor and 1031 Owner.

    (c)     As provided in a Court Order.

5.      Agreements to Govern. The duties and obligations of the Escrow Agent hereunder shall be determined solely by the express provisions of this Escrow Agreement.

6.      Liability.

      (a)      Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or for the form of execution thereof, or for the identity or authority of any person executing or depositing such subject matter. Escrow Agent shall be under no duty (i) to interpret the EA, the AFA, or any related agreement, or (ii) to investigate or inquire as to the validity or accuracy of any document, agreement, instruction or request furnished to it hereunder believed by it to be genuine and Escrow Agent may rely and act upon, and shall not be liable for acting or not acting upon, any such document, agreement, instruction or request. Escrow Agent shall in no way be responsible for notifying, nor shall it be its duty to notify, any party hereto or any other party interested in this Escrow Agreement of any disbursement made under the terms of this Escrow Agreement. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential, or punitive damages. The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Demolition Funds, any account in which any portion of the Demolition Funds is deposited, or this Escrow Agreement, or to appear in, prosecute, or defend any such legal action or proceeding. If any portion of the Escrow Fund is at any time attached, garnished, or levied upon under any final, non-appealable order; or in case any disbursement shall be stayed or enjoined by any final, non-appealable order; or in case any final, non-appealable order, judgment, or decree shall be made or entered by any court affecting the Demolition Funds or the disbursement thereof, the Escrow Agent shall promptly notify the parties of such action and is authorized, in its sole discretion, to rely upon and comply with any such final, non-appealable order which Escrow Agent is advised by legal counsel selected by Escrow Agent is binding upon it and if the Escrow Agent complies with any such Court Order, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance.

      (b)      All of the terms and conditions in connection with the Escrow Agent's duties and responsibilities are contained in this instrument, and the Escrow Agent is not expected or required to be familiar with the provisions of any other instrument or agreement among 1031 Owner or Contractor or anyone else and shall not be charged with any responsibility or liability in connection with the observance or nonobservance by anyone of the provisions of any such instrument or agreement. The Escrow Agent may rely and shall be protected in acting upon any paper or other documents which may be submitted to it in connection with its duties hereunder and which is believed by it to be genuine and have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity thereof. This Escrow Agreement constitutes the entire agreement between the Escrow Agent and the other parties hereto in connection with the subject matter of this escrow, and no other agreement entered

into between the parties, or any of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow: Agent notwithstanding that any such other agreement may be referred to herein or deposited with Escrow Agent or the Escrow Agent may have knowledge thereof, and Escrow Agent's rights and responsibilities shall be governed solely by this Escrow Agreement

7.  Indemnification of Escrow Agent. From and at all times after the date of this Escrow Agreement, 1031 Owner shall, to the fullest extent permitted by law and to the extent provided herein, indemnify and hold harmless the Escrow Agent and each director, partner, officer, employee, attorney, agent and affiliate of the Escrow Agent (each an "Indemnified Party" and collectively the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation 1031 Owner and Contractor, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any civil law, common law, or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation.  This indemnity shall include, but not be limited to, all costs incurred in conjunction with any interpleader which the Escrow Agent may enter into regarding this Escrow Agreement or the Escrow Account. All representations, covenants, and indemnifications contained in this Article 7 shall survive the termination of this Escrow Agreement. ALL INDEMNITIES IN THIS PARAGRAPH WILL BE ENFORCED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW FOR· THE BENEFIT OF THE INDEMNIFIED PARTY THEREOF, EVEN IF THE APPLICABLE CLAIM IS CAUSED BY THE ACTIVE OR PASSIVE, JOINT, CONCURRENT OR COMPARATIVE NEGLIGENCE OR INTENTIONAL MISCONDUCT OF SUCH INDEMNIFIED PARTY, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT OR STRICT LIABILITY IS IMPOSED UPON OR ALLEGED AGAINST THE INDEMNIFIED PARTY.

8.  Resignation of the Escrow Agent; Appointment of Successor.  The Escrow Agent, or any successor to it hereafter appointed, may at any time resign by giving notice in writing to 1031 Owner and Contractor and shall be discharged from its duties hereunder upon the appointment of a successor Escrow Agent as hereinafter provided, or upon the expiration of fifteen (15) days after such notice is given.

9.  Resolution of Disputes.  If, at any time, there shall exist any disagreement or dispute (a "Dispute") between 1031 Owner and Contractor with respect to the holding or disposition of any portion of the Escrow Funds or any other obligation of the Escrow Agent hereunder, or if at any time the Escrow Agent is unable to determine, to the Escrow Agent's satisfaction, the proper disposition of any portion of the Escrow Funds, then the Escrow

Agent may take either or both of the following actions: (i) suspend the performance of any of its obligations under this Escrow Agreement until such Dispute or uncertainty shall be resolved to the satisfaction of the Escrow Agent; and/or (ii) petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction for instructions with respect to such Dispute or uncertainty, and, if Escrow Agent deems appropriate in its sole discretion, deposit into the registry of such court all property held by it in the Escrow Account for holding and disposition in accordance with the instructions of such court. The Escrow Agent is under no duty to institute or defend any proceedings related to any such Dispute or uncertainty, and none of the costs and expenses of any such proceedings shall be borne by the Escrow Agent. The rights of Escrow Agent under this sub-paragraph are cumulative of all other rights which it may have by law or otherwise. In the event that any controversy should arise among the parties with respect to the Escrow Agreement, or should the Escrow Agent resign and the parties fail to select another Escrow Agent to act in its stead, the Escrow Agent shall have the right to institute a bill of interpleader in any court of competent jurisdiction to determine the rights of the parties and, if Escrow Agent deems appropriate in its sole discretion, to deposit all Escrow Funds with such court.

10. Compensation and Expenses.

   (a)   Escrow Agent shall be entitled to reasonable compensation as well as reimbursement for all costs and expenses incurred in connection with the performance by it of service under this Escrow Agreement (including all fees and expenses of Escrow Agent's counsel) (the "Escrow Fees") and 1031 Owner agrees to so pay Escrow Agent reasonable compensation and reimburse Escrow Agent for reasonable costs and expenses, and Contractor shall have no liability therefor. Payment of the Escrow Fees is due on presentation of an invoice from the Escrow Agent and shall be borne by 1031 Owner.

   (b)   All Escrow Fees shall be paid to the Escrow Agent within thirty (30) days after notice by the Escrow Agent to 1031 Owner, which notice shall be accompanied by a statement of such fees and expenses.

   (c)   The Escrow Agent shall not have a lien on and may not offset against the Escrow Funds to the extent any Escrow Fees are not paid when due or for any other reason.

11. Discharge of Escrow Agent.  Upon the delivery of all of the subject matter or monies pursuant to the terms of this Escrow Agreement, the duties of Escrow Agent shall terminate and Escrow Agent shall be discharged from any further obligation hereunder.

12. Miscellaneous.

   (a)   Amendment.  This Escrow Agreement may be amended only by a writing executed by 1031 Owner, Contractor and the Escrow Agent.

   (b)   Entire Agreement.  This Escrow Agreement sets forth the entire understanding of the parties hereto regarding the subject matter hereof and supersedes all prior contracts, agreements, arrangements, communications, discussions, representations

and warranties, whether oral or written, between the parties regarding the subject matter hereof.

(c)    Ownership.  For all purposes, including, without limitation, federal and other taxes based on income, Contractor will be treated as the owner of the Escrow Funds and Contractor will report all income, if any, that is earned on, or derived from, the Escrow Funds as its income in the taxable year or years in which such income is properly includable and pay any taxes attributable thereto.  The Escrow Funds will not form part of the estate of the 1031 Owner in the event of any bankruptcy or insolvency proceedings and will not be subject to any other claims of creditors of the 1031 Owner.

(d)    Notices.   Any notice, consent, request or other communication required or permitted to be given hereunder shall be in writing and shall be given to the parties at the following address:

| | |
|---|---|
| Contractor: | David H. Griffin, Jr.<br>President<br>D.   H.   Griffin   Wrecking<br>Company, Inc.<br>4716 Hilltop Road<br>Greensboro, NC 27407<br><br>and<br><br>Larry Gillen, Esq.<br>General Counsel<br>D.   H.   Griffin   Wrecking<br>Company, Inc.<br>4716 Hilltop Road<br>Greensboro, NC 27407 |
| 1031 Owner: | Chandra M. Kailas<br>Manager<br>3525 N. Causeway Blvd<br>Suite 1040<br>Metairie, LA 70002 |
| Escrow Agent: | |

A party may change its address by providing written notice of the new address to the other parties to this AFA.  Notices and other communications shall be (a) personally delivered; or (b) delivered by FedEx or other overnight delivery service; or (c) transmitted by U.S. mail, post pre-paid, registered or certified mail, return receipt requested.  All notices and other communications shall be deemed to have

been duly given on the first to occur of actual receipt of such notice or refusal of delivery.

(e)   Governing Law.  This Escrow Agreement is being made in and is intended to be construed according to the laws of the State of Louisiana.  It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns. EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF ORLEANS PARISH, STATE OF LOUISIANA, OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS ESCROW AGREEMENT.  EACH PARTY HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS DESCRIBED ABOVE AND COVENANTS THAT IT SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH IN THIS SECTION OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.  EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS.

(f)   Severability.  If any one or more of the provisions of this Escrow Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Escrow Agreement shall not be affected thereby. To the extent permitted by applicable law, each party hereto waives any provision of law which renders any provision of this Escrow Agreement invalid, illegal or unenforceable in any respect.

(g)   Waivers.  Any waiver by any party of any violation of, breach of or default under any provision of this Escrow Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or waiver of any other violation of, breach of or default under any other provision of this Escrow Agreement or any other agreements provided for herein.

(h)   Headings.  The headings in this Escrow Agreement are solely for convenience of reference and shall not be given any effect in the construction or interpretation of this Escrow Agreement.

(i)   Third Parties.  Nothing expressed or implied in this Escrow Agreement is intended, or shall be construed, to confer upon or give any person or entity other than 1031 Owner, Contractor and the Escrow Agent any rights or remedies under, or by reason of, this Escrow Agreement.

(j)     Force Majeure. Escrow Agent shall not be liable to the undersigned for any loss or damage arising out of any acts of God, strikes, equipment or transmission failure, war, terrorism, or any other act or circumstance beyond the reasonable control of Escrow Agent.

(k)     Written Agreement. This Escrow Agreement represents the final agreement between the parties, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

(l)     Counterparts. This Escrow Agreement may be executed in one or more counterparts and all such counterparts shall be deemed to be originals and together shall constitute one and the same instrument.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

## EMERGENCY PUBLIC WORKS AGREEMENT

| | | | |
|---|---|---|---|
| AGENT: | D.H. Griffin Wrecking Company, Inc. | CONTRACT NO.: | |
| ADDRESS: | 4716 Hilltop Road | | |
| | Greensboro, NC 27407 | EFFECTIVE DATE: | March ___, 2020 |
| | | | |
| AGENT | | STATE | |
| REPRESENTATIVE: | David Griffin | REPRESENTATIVE: | Governor John Bel Edwards |
| TELEPHONE: | 336-855-7030 | TELEPHONE: | 225-342-7015 |
| MOBILE: | 336-382-5200 | MOBILE: | |
| EMAIL: | dhgriffinjr@dhgriffin.com | FACSIMILE: | 225-342-7099 |

Pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721, *et seq.*, and the State Public Bid Law, La. R.S. 38:2181, *et seq.*, this Emergency Public Works Agreement ("Contract" or "Agreement") is entered into between The State of Louisiana ("State") and D.H. Griffin Wrecking Company, Inc. ("DHGW" or "Agent") as of the Effective Date stated above. Agent acknowledges receipt of the Contract Documents, which consist of the following documents that are made a part of this Contract:

This Emergency Public Works Agreement;

| | |
|---|---|
| Exhibit "A" | Emergency Public Works Agreement Terms and Conditions; |
| Exhibit "B" | Scope of Work; |
| Exhibit "C" | Payment Schedule; |
| Exhibit "D" | Immunity and Indemnity Exceptions; |
| Exhibit "E" | Time and Material Rates; |
| Exhibit "F" | Site Property Legal Descriptions. |

1.  SCOPE OF WORK: The "Scope of Work" is the demolition of the partially collapsed building located at 1031 Canal Street, New Orleans, Louisiana (the "Hard Rock Building") and related work as described in Exhibit "B". The Scope of Work consists of three phases as follows:

| | |
|---|---|
| Phase 1: | Demolition of the buildings bearing the municipal addresses 1019/1025 Canal Street, 1027 Canal Street, and 1022 Iberville Street, New Orleans, Louisiana (the "Red Zone Buildings"), by conventional (mechanical) means. |
| Phase 2: | Demolition of the Hard Rock Building by controlled demolition using explosive charges. |
| Phase 3: | Removal and disposal of Demolished Materials. |

Except as specified elsewhere in this Contract, Agent shall furnish all labor, materials, tools, supplies, equipment, transportation, supervision, technical, professional, and other services, and shall perform all operations necessary or required, to satisfactorily complete the Scope of Work further described in Exhibit B.

2.  CONTRACT PRICE: As full consideration for Agent's performance of this Contract, the Agent shall be paid the sum of Sixteen Million, Three Hundred Eighty One Thousand, Seven Hundred and Forty Dollars ($16,381,740) (the "Contract Price") payable by wire transfer(s) to a bank account

designated by Agent pursuant to the payment schedule agreed to by Agent and 1031 Canal Development, LLC.] The Contract Price shall be allocated as follows:

Phase 1: $100,000.00;

Phase 2 and Phase 3: $16,281,740.

The Contract Price is to be paid as set forth in Exhibit C.

The Contract Price does not include work not specifically included in the Scope of Work (Exhibit B), except for work reasonably inferable therefrom.

The State will not be liable to Agent, or any of the Agent's subcontractors, for any amounts, including the Contract Price, for any reason in connection with the Scope of Work, except for the State's obligations contained in Exhibit A.   Agent represents that it has made satisfactory arrangements with 1031 Canal Development, LLC and its insurers for payment, and agrees that it will look solely to those parties for payment for the Scope of Work.  Further, Agent and its subcontractors will not make or attempt to make any claims whatsoever against the State in the event of a default on any and all payments for the Scope of Work from 1031 Canal Development, LLC or its insurers.

3.      CONTRACT TIME: Agent shall commence performance under this Contract as provided in Exhibit A.  Agent shall achieve completion of the Scope of Work as provided in Exhibit A of the Scope of Work not later than one hundred twenty (120) days following the Commencement Date established in a Notice to Proceed (the "Contract Time"), subject to Force Majeure delays.

4.      This agreement may be executed in counterparts.

| STATE OF LOUISIANA: | | D.H. GRIFFIN WRECKING COMPANY, INC.: | |
|---|---|---|---|
| Authorized Signature: | | Authorized Signature: | |
| Print Name: | John Bel Edwards | Print Name: | David Griffin |
| Print Title: | Governor | Print Title: | President |
| | State of Louisiana | | D. H. Griffin Wrecking Company, Inc. |
| Date: | | Date: | |

CONSENT TO AGREEMENT:

1031 Canal Development, LLC, on behalf of itself and its agents, officers, directors, managers, members, shareholders, employees, insurers, and representatives of any of them, in consideration of the benefits conferred herein, agrees to and accepts the terms of this Agreement and agrees to allow Agent, its employees and subcontractors to perform the Scope of Work in accordance with the terms of this Agreement.

1031 CANAL DEVELOPMENT, LLC

1022 Iberville, LLC, on behalf of itself and its agents, officers, directors, managers, members, shareholders, employees, insurers, and representatives of any of them, in consideration of the benefits conferred herein, agrees to and accepts the terms of this Agreement and agrees to allow Agent, its employees and subcontractors to perform the Scope of Work in accordance with the terms of this Agreement.

Authorized Signature: _____

Authorized
Signature: _Chandra M. Kailas_

Print Name: _Chandra M. Kailas_
Title: Manager
Date: 3/6/2020

Print Name: _Todd Trosclair_
Title: Manager
Date: 3-6-2020

1025 Canal, LLC, on behalf of itself and its agents, officers, directors, managers, members, shareholders, employees, insurers, and representatives of any of them, in consideration of the benefits conferred herein, agrees to and accepts the terms of this Agreement and agrees to allow Agent, its employees and subcontractors to perform the Scope of Work in accordance with the terms of this Agreement.

Authorized
Signature: _Chandra M. Kailas_

Print Name: _Chandra M. Kailas_
Title: Manager
Date: 3/6/2020

Canaux, LLC, on behalf of itself and its agents, officers, directors, managers, members, shareholders, employees, insurers, and representatives of any of them, in consideration of the benefits conferred herein, agrees to and accepts the terms of this Agreement and agrees to allow Agent, its employees and subcontractors to perform the Scope of Work in accordance with the terms of this Agreement.

Authorized
Signature: _Chandra M. Kailas_

Print Name: _Chandra M. Kailas_
Title: Manager
Date: 3/6/2020

**EXHIBIT A TO EMERGENCY PUBLIC WORKS AGREEMENT**

**TERMS AND CONDITIONS**

**1.     COMMENCEMENT DATE**

The Commencement Date for the Scope of Work shall be established in a Notice to Proceed issued by State to Agent.  The Notice to Proceed shall not issue until all conditions precedent to the performance of the Scope of Work have occurred, including, but not limited to, 1) execution of this Agreement by the State; 2) the State has designated the occurrence of the collapse of the structure commonly known as the Hard Rock Building at the corner of Canal and Rampart Streets in New Orleans as an Emergency pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:271, *et seq.*, and the State Public Bid Law, La. R.S. 38:2181, *et seq.*; and 3) Agent has received confirmation that the Mobilization Payment has been deposited in Agent's bank account; 4) all permits for the demolition of the Hard Rock Building and Red Zone Buildings have been issued by governmental authorities having jurisdiction; 5) approval of the project specific insurance as required in Section 13; and, 6) 1031 Owner has secured all required approvals from its builder's risk insurer. Thereafter, Agent shall undertake and complete the Scope of Work required by, and reasonably inferable from, the Contract Documents in accordance with the requirements of the Contract Documents and applicable Laws and Regulations. The Contract Documents constitute the entire integrated Agreement between State and Agent and supersede all prior negotiations, proposals, representations, or agreements, either written or oral. The Contract Documents may be amended or modified only by a writing signed by both State and Agent and consented to by any Consenting Party affected by such amendment or modification.

**2.     RELATIONSHIP**

Under this Agreement, Agent and Agent's Subagents (as described herein) are each acting as an agent or representative of State engaged in homeland security, emergency preparedness, and recovery activities acting pursuant to State's declaration of a state of emergency pursuant to La. R.S. 29:721 *et seq.*, with respect to all authorized work performed pursuant to this Agreement and all authorized actions carried out in furtherance of this Agreement.

This Agreement is solely for the benefit of State, Agent and Agent's Subagents (as described herein), and nothing in the Contract Documents shall be deemed or construed to create a contractual relationship of any kind between any persons other than State, Agent and Agent's Subagents (as described herein). **State, Agent and Agent's Subagents specifically agree that all work performed pursuant to this Agreement and all actions carried out in furtherance of this Agreement are to be performed pursuant to La. R.S. 29:721, *et seq.*, including the immunity under La. R.S. 29:735; provided, however, that this immunity shall be subject to the exceptions set forth in Exhibit D.**

State shall have the right to request removal of any Agent employee, Subagent, Subagent employee, supplier, or supplier employee, or their agents who in State's sole opinion, has engaged in improper conduct, is not performing in a satisfactory manner or is not qualified to perform assigned Work. Agent shall promptly comply with such request.

**3.     FIRM PRICES**

The Contract Price shall not be subject to adjustment due to any escalation in the cost of labor, material, fuel, or equipment, regardless of whether such escalation was reasonably foreseeable at the time of contracting.

**4.     SUBAGENTS/ASSIGNMENT**

State, Agent and Agent's Subagents expressly agree that the following shall be considered Agent's Subagents for purposes of this Agreement: Controlled Demolition, Inc. ("CDI"), Thornton Tomasetti, Inc. ("TTI"), and any other subagent approved by State.

Agent's Subagents shall be entitled to immunity as set forth in Section 2, and indemnity as set forth in Section 12.

Except for services to be performed by Agent's Subagents, Agent shall not delegate or assign any duties, rights, payments, or claims under this Agreement without the express written consent of State. Any assignment or delegation made without State's consent shall be voidable at the sole discretion of State.

**5.     TAXES**

The Contract Price includes all federal, state, and local taxes, including any sales, consumer, and use taxes required by applicable Laws and Regulations.

**6.     AGENT'S RESPONSIBILITIES GENERALLY**

Agent shall diligently pursue the performance of the Scope of Work and achieve completion within the Contract Time set forth in this Agreement.

Agent shall perform the Scope of Work in a good and workmanlike manner.

Agent shall perform the Scope of Work with the degree of learning, skill, care, and expertise possessed by a person providing similar services on similar projects under the same or similar circumstances.

Agent shall be responsible for supervision of its employees and of any other person engaged to perform any portion of Agent's Scope of Work under this Agreement, including, but not limited to, Subagents of any tier, and suppliers of labor, materials, equipment, and machinery of any tier.

7.      CLEANUP & REMOVAL

The Contract Price includes the removal and disposal of any and all building components (except only the slabs and foundations) materials, equipment, rubbish, and/or debris from the Site ("Demolished Materials"). Agent shall have all salvage rights to Demolished Materials to the extent (a) consistent with the evidentiary orders issued by the court in the litigation arising from the collapse of the Hard Rock Building and (b) permitted by the owners of the Red Zone Buildings and Hard Rock Building.

Agent shall not be responsible for broken windows or any other damages claimed by persons whose businesses and/or properties are not listed in Exhibit D.

8.      TIME IS OF THE ESSENCE

TIME IS OF THE ESSENCE in Agent's performance and completion of the Scope of Work. Neither State nor Agent nor any Subagent shall be liable to the others for any default or delay that arises from a Force Majeure. In the event of a Force Majeure, the parties shall cooperate in good faith with the others and undertake commercially reasonable efforts to minimize and mitigate the impact of such event.

Neither State nor Agent nor any Subagent shall be liable to the others for any default or delay that arises from delays in the performance of pre-demolition work that is the responsibility of the owners of the Hard Rock Building or Red Zone Buildings.

9.      COMPLETION

Agent's work shall be complete upon the removal and proper disposal of all Demolished Materials from the Site.

10.      PAYMENT OF OTHERS

Agent shall pay for, or cause to be paid for, in full, Agent's obligations to any person employed or engaged to perform any portion of Agent's Scope of Work under this Agreement, including, but not limited to, employees, Subagents of any tier, and suppliers of labor, materials, equipment, and machinery of any tier.

11.      PROTECTION OF PERSONS AND SITE

Agent shall undertake commercially reasonable safety precautions and comply with all applicable Laws and Regulations in connection with the performance of the Scope of Work, but will not be responsible for site security, police protection, or fire protection.

Agent shall undertake commercially reasonable precautions for the safety of, and shall provide the necessary protection to limit damage, injury or loss to, all persons who may be affected by the performance of the Scope of Work. But due to the nature of the Scope of Work, Agent cannot warrant that there will not be damage to persons or property near the Site. In addition to immunity set forth in Section 2, State will provide the indemnity set forth in Section 12.

When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Scope of Work, Agent shall exercise reasonable care and carry on such activities only under supervision of properly qualified personnel.

12.      INDEMNIFICATION

        12.1      Subject to the exceptions set forth in the following paragraph and in Exhibit D, State unconditionally agrees to save, defend, indemnify, and hold harmless the Agent Indemnitees from and against any and all liability, loss, damage, and expenses (including legal fees and disbursements), which are threatened against, sustained, or suffered by the Agent Indemnitees, or any of them, arising out of or resulting from the Scope of Work performed

pursuant to this Agreement and all reasonable actions carried out in furtherance of this Agreement, provided that such liability, loss, damage, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property regardless of whether or not such liability, loss, damage, or expense is caused in whole or in part by a person indemnified hereunder, including Agent Indemnitees since they are serving as agents and representatives of State.

Notwithstanding the foregoing, State shall not be obligated to defend or indemnify any Agent Indemnitee for any liability, loss, damage, or expenses to the extent adjudicated to be attributable to the negligence of such Agent Indemnitee or any of their employees or subcontractors.  Further, the State shall have no obligation to save, defend, indemnify, and hold harmless the Agent Indemnitees from and against any liability, loss, damage, or expenses (including legal fees and disbursements) arising out of any claims by any employees, contract employees, or subcontractors of Agent Indemnitees, for any reason (including, but not limited to, claims for worker's compensation or unpaid wages).

12.2   Furthermore, State does hereby release and forever discharge the Agent Indemnitees from any and all claims, demands, liabilities, losses, damages, expenses, and causes of action including, but not limited to, claims for personal injury (including death) and loss or damage to personal and real property arising out of, or in connection with, the Scope of Work. Agent Indemnitees shall have no liability to State, and State hereby waives any claim, for compensation, expenses, special, indirect or consequential damages or losses or loss of use, or any other costs attributable to the performance of the Scope of Work.

12.3   This indemnity is given under the authority granted by La. R.S. 29:724D(1), 38:2182, and Proclamation No. 161 JBE 2019.

12.4   Agent Indemnitees, or their insurers, shall have the sole and exclusive right to direct and control the defense of any litigation arising out of any liability, loss, damage, or expense indemnified hereunder with counsel of their own choosing until such time as the coverage limits of the project specific insurance provided for in Section 13.  Once the project specific insurance is exhausted, the State will have the sole and exclusive right to direct and control the defense of any litigation arising out of any liability, loss, damage, or expense indemnified hereunder with counsel of the State's own choosing.

12.5   This Section 12 shall survive expiration or termination of the Agreement.

12.6   It is the intention of the parties to this Agreement that the insurance provided for in section 13 shall cover defense and indemnity Claims that may be made against the State by the Agent Indemnitees up to the policy limits.  Except as provided in Section 12.7, the State's obligation to pay for the defense and indemnity of Agent Indemnitees shall only be triggered upon exhaustion of the project specific insurance provided for in Section 13.

12.7   It is the intention of the parties to this agreement that, notwithstanding any provision of this Agreement or any applicable law to the contrary, the State, independent of the project specific insurance coverage provided for in Section 13, shall save, defend, indemnify, and hold harmless the Agent Indemnitees from and against any Claims asserted on behalf of Quinnyon Wimberly and/or Jose Ponce Arreola (the "Decedents"), or members of their families, including but not limited to, spouses, partners, children, parents, brothers, sisters, and grandparents, arising out of the performance of the Scope of Work with Decedents' remains trapped within the Hard Rock Building.

13.   INSURANCE

Prior to commencing work, Agent shall procure, at Agent's expense, project specific general liability insurance provided on an ISO CG 00 01 12 07 or 00 01 04 13 form, including loss of use caused by the Scope of Work under this Agreement, regardless of whether the loss of use is associated with physical damage to property, that may arise out of Agent's operations under this Agreement.  The insurance will apply to all third party claims for personal injury and property damage arising out of the Scope of Work without regard to physical location.  The insurance shall be written with an aggregate liability limit of at least $50,000,000 by one or more insurance companies licensed by the State and having a minimum AM Best rating of A-VIII. Such insurance may be obtained through the procurement of a combination of primary and excess policies, provided any excess policies shall afford coverage at least as broad as the primary policy, as described above. In no event will the primary policy in such tower of insurance have less than $1,000,000 per occurrence and $2,000,000 general aggregate limits of liability.  Such insurance shall be limited to liability arising out of the operations of Agent and its Subagents in performing the Scope of Work under this Agreement.

State, the City of New Orleans, Agent's sub-agents, 1031 Canal Development, LLC, Kailas Companies, LLC, Chandra Mohan Kailas, 1025 Canal Street, LLC, Canaux, LLC, 1022 Iberville, LLC and their respective members shall be named as additional insureds under the insurance procured by Agent on ISO ongoing operations forms CG 20 10 04 13 or CG 20 38 04 13 and on

ISO completed operations form CG 20 37 04 13, or another endorsement explicitly approved by the parties to this Agreement in writing.  This insurance for the additional insureds shall be at least as broad as the coverage provided for the Agent as the Named Insured. It shall apply as Primary and Non-Contributing Insurance before any other insurance or self-insurance, including any deductible or self-insured retention, maintained by or provided to any of the additional insureds. Any policy obtained to comply with the requirements set forth herein shall be endorsed to include waivers of subrogation in favor of each of the entities qualifying as additional insureds. Such insurance shall contain no restriction on coverage in the event that any insured under the policy brings a claim against any other insured under the policy.

Agent shall maintain this coverage for itself and all additional insureds for the duration of the project and at least one (1) year after completion of the Work. Agent shall provide a full certified copy of every policy obtained to comply with the requirements herein within seven (7) days of a request for the same from any entity qualifying as an additional insured on such insurance.

This Agreement will be null and void unless and until State, the City of New Orleans, Agent's sub-agents, 1031 Canal Development, LLC, Kailas Companies, LLC, Mohan Kailas, and their respective members approve, in writing, the policy or policies of the project specific insurance required by this Section 13.  The issuance of such insurance shall be a condition precedent to the validity and enforceability of this Agreement.

Agent shall maintain automobile liability insurance covering vehicles owned, and non-owned vehicles used, by the Contractor for bodily injury, death of any person, and property damage arising out of the ownership, maintenance and use of those motor vehicles.  Agent shall maintain workers' compensation insurance in compliance with statutory requirements.  Agent shall supply certificates of insurance evidencing such coverages upon contract execution. o  Capitalized terms used in the Contract Documents shall have the meanings ascribed to them in the Contract Documents, or if not defined therein, then they shall have the meanings commonly accorded them in like circumstances."

14.    NOTICES

Any notice required or otherwise given pursuant to this Agreement shall be in writing and shall be transmitted by facsimile, or mailed certified mail, return receipt requested, postage prepaid or hand delivered to the other party's representative listed in the Agreement, or as subsequently substituted by written notice.

15.    DISPUTES

The parties will endeavor in good faith to resolve any Claim through negotiation.

Any Claim not resolved by negotiation, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association ("AAA") in effect as of the date of filing, unless the parties mutually agree otherwise. A demand for arbitration shall be made in writing, delivered to the other party to the Agreement, and filed with AAA. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded. A demand for arbitration shall be made within the time limits specified by applicable Laws and Regulations, and in no event shall it be made after the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable prescriptive period (statute of limitations) or preemptive period (statute of repose).

The location of the arbitration shall be Baton Rouge, Louisiana unless the parties otherwise mutually agree in writing.

The award of the arbitrator(s) shall be final and binding upon the parties without the right of appeal to the courts. Judgment may be entered upon it in accordance with applicable Legal Requirements by any court having jurisdiction thereof.

The interpretation of this Agreement, and any Claims shall be governed by the laws of the State of Louisiana, without regard to its conflict of laws provisions.

16.    REMEDIES

Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to, and not a limitation of, duties, obligations, rights, and remedies otherwise imposed or available by law.

No action or failure to act by State, Agent, Agent's Subagents, or any other signatory to this Agreement shall constitute a waiver of any rights or duties afforded them under the Agreement, nor shall such action or failure to act constitute approval of, or acquiescence in, a breach of this Agreement, except as the parties may specifically agree in writing.

17.    GENERAL PROVISIONS

The partial or complete invalidity of any one or more Articles of this Agreement shall not affect the validity, enforceability, or effect of any other Article or the valid portions of the affected Article..

Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

Capitalized terms used in the Contract Documents  shall have the meanings ascribed to them in the Contract Documents, or if not defined therein, then they shall have the meanings commonly accorded them in like circumstances.

Titles, captions, and numbering used in this Agreement are for convenience only and shall not be used in the interpretation of any provision of this Agreement.

Neither State nor Agent shall be deemed to be the drafter or author of this Agreement for purposes of construing and interpreting this Agreement in any context.

## 18.    DEFINITIONS

"Agent Indemnitees" means the Agent, Agent's Subagents, Agent's consultants, Agent's affiliated and subsidiary companies, and the agents, officers, directors, managers, members, shareholders, employees, insurers, and representatives of any of them.

The term "day" as used in this Agreement shall mean calendar day unless otherwise specifically defined.

A "claim" is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, adjustment of the Contract Price, adjustment of the Contract Time, or other relief with respect to the requirements of the Contract Documents, including the terms of this Agreement. The term "Claim" also includes any other disputes and matters in question between State, Agent and Agent's Subagents arising out of or relating to the Work or the parties' relationship. The responsibility to substantiate Claims shall rest with the party making the Claim.

"Consenting Party" means the persons who have consented to the Agreement, specifically 1031 Canal Development, LLC, 1025 Canal Street LLC, Canaux LLC, and 1022 Iberville, LLC.

"Force Majeure" means an event or occurrence that (1) is beyond the control of the party claiming Force Majeure; (2) did not result, in whole or in part, from the fault or negligence of the party claiming Force Majeure; and (3) could not be avoided or overcome through the exercise of due diligence, including, without limitation, acts of God or of a public enemy, acts of the Government in either its sovereign, judicial or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, lockouts, or boycotts of regional or national origin not directed solely at Agent, nationwide material or labor shortages, embargoes, and, unusually severe weather; provided, however, that default by a person employed or engaged by Agent to perform a portion of Agent's Work shall not constitute a Force Majeure.

"Hard Rock Building" means the incomplete and partially collapsed structure located at 1031 Canal Street, New Orleans, Louisiana, that is owned by 1031 Canal Development, LLC.

"Laws and Regulations" means all federal, state, and local codes, laws, ordinances, rules, and statutes; all permit or license requirements; all approvals, authorizations, decrees, judgments, orders, rulings, regulations, or decisions of any federal, state, or local governmental bodies having jurisdiction over the parties to the Agreement, the Work, or the Site(s) where Work is being performed; and, all decrees, decisions, judgments, orders, or rulings by any federal, state, or local court having jurisdiction over the parties to the Agreement, the Work, or the Site(s) where Work is being performed.

"Person" means any natural or juridical person as defined by La. Civil Code art. 24, including, but not limited to, corporations, partnerships, joint ventures, and any other business association or organization.

"Red Zone Buildings" means, individually and collectively, the structures bearing the municipal addresses 1019/1025 Canal Street, 1027 Canal Street, and 1022 Iberville Street, New Orleans, Louisiana, which are owned by 1025 Canal Street LLC, Canaux LLC, and 1022 Iberville, LLC, respectively.

"Site" means the real property bearing the municipal addresses 1031 Canal Street, 1019/1025 Canal Street, 1027 Canal Street, and 1022 Iberville Street, New Orleans, Louisiana, both collectively and individually.  The legal property descriptions for the properties constituting the Site are attached as Exhibit F.

**EXHIBIT B TO EMERGENCY PUBLIC WORKS AGREEMENT**

**SCOPE OF WORK**

All labor, materials, tools, supplies, equipment, transportation, supervision, technical, professional, and other services required to bring about the demolition of the Red Zone Buildings by conventional (mechanical) means, the demolition of the Hard Rock Building by controlled demolition using explosive charges, and the removal and disposal of Demolition Materials.

**Inclusions**

- Disconnection and protection of utilities.

- Commercially reasonable efforts to protect properties and public infrastructure (sidewalks, streets, streetcar tracks) located in the 1000 block of Canal Street, the 100 block of North Rampart (including specifically the historic Saenger Theatre property and improvements), the 1000 block of Iberville Street, and the 100 block of Burgundy Street.

- Onsite construction trailer and related items.

- Inspections and surveys of all properties listed in Exhibit D prior to and post demolition, which shall be provided to State, the City of New Orleans and 1031 Canal Development, LLC in native format. Seismic monitoring shall also be included and all deliverables therefrom shall be provided to State, the City and 1031 Canal Development, LLC.

- Removal of mobile rental equipment and tools located on floors 1-7 of the Hard Rock Building that can be safely removed through the ramps, which items will be moved to grade (street) level at the Site for removal by others.  This work will be subject to the November 26, 2019 Order in Civil Action 2019-10819 and the December 4, 2019 Order in Civil Action No. 2019-10912 pending in the Orleans Parish Civil District Court; provided, however, that the photographing and inventory of items will be by others and will be scheduled so as to not unduly impede Agent's work.

- Implementation of an education plan to inform property owners regarding recommended measures to be taken to reduce possible adverse effects resulting from the Hard Rock Building implosion.

- Provision of commercially reasonable measures to protect the properties from damage and to reduce dust emissions, which may include sprayers and blast blankets.

- Demolition of the Red Zone Buildings by conventional (mechanical) means.

- Demolition of the Hard Rock Building by controlled demolition using explosive charges.

- Removal and disposal of Demolished Materials from the Site.

- Debris removal from the streets and sidewalks of the 1000 block of Canal Street, the 1100 block of Canal Street, the 100 block of North Rampart Street, the 1000 block of Iberville Street, and the 100 block of Burgundy Street.

- 1031 Canal Development, LLC, Kailas Companies, LLC, 1025 Canal, LLC, Canaux, LLC, and 1022 Iberville, LLC each relinquishes to D. H. Griffin all salvage rights to Demolished Materials except those Demolished Materials marked as evidence pursuant to any court-approved evidence preservation protocol (including a protocol substantially similar to that attached hereto as Exhibit B-1).

- Assistance with government officials and others in the recovery of human remains.

- Agent shall coordinate its work and provide reasonable assistance with evidence preservation as set forth in any court-approved evidence preservation protocol (including a protocol substantially similar to that attached hereto as Exhibit B-1).

{N3979075.2}

- The Contract Price and Contract Time shall not be increased on account of the recovery of human remains.

- Wash down the 1000 block of Canal Street, the 100 block of North Rampart, the 1000 block of Iberville Street, and the 100 block of Burgundy Street.as necessary to clean dust generated by the implosion of the Hard Rock Building.

**Exclusions**

- Shoring of adjacent properties.

- Agent excludes weatherproofing, waterproofing, flashing, roofing, roofing materials, masonry, framing and other items or services required to make the walls of adjacent buildings exposed by the demolition of the Red Zone Buildings weather resistant.  Agent expressly disclaims legal responsibility for making these adjacent buildings weather resistant, and for claims for water infiltration into these adjacent buildings.

- Asbestos and other hazardous material removal and/or remediation.

- Purchase or rental of fencing, barricades, and traffic control.

- Cost of permits.

- Site security, police protection, or fire protection.

- Protection of traffic lights and street lights.

- Removal of rental equipment and tools located above floor 7 of the Hard Rock Building.

- Demolition of the Hard Rock Building foundation slab(s) and foundation(s).

- Demolition of the Red Zone Buildings' foundation slabs and foundations.

- Legal responsibility arising from assistance with the retrieval of human remains and materials for possible use as evidence in legal proceedings.

- Agent disclaims responsibility for damage to Hard Rock Building foundation(s) and slab(s) and Red Zone Buildings' foundation(s) and slab(s), but will use reasonable efforts to prevent such damage.  The respective owners of the Hard Rock Building and the Red Zone Buildings shall accept the foundations and slabs in their then-current condition at the conclusion of the Scope of Work.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**EXHIBIT C TO EMERGENCY PUBLIC WORKS AGREEMENT**

**PAYMENT SCHEDULE**

The Contract Price for the Project ($ 16,381,740) shall be paid to Agent as follows:

| Event | Amount |
|---|---|
| Mobilization Payment | 4,000,000.00 |
| Implosion Payment | 4,000,000.00 |
| Week 1 | 500,000.00 |
| Week 2 | 500,000.00 |
| Week 3 | 500,000.00 |
| Week 4 | 500,000.00 |
| Week 5 | 500,000.00 |
| Week 6 | 500,000.00 |
| Week 7 | 500,000.00 |
| Week 8 | 500,000.00 |
| Week 9 | 438,174.00 |
| Week 10 | 438,174.00 |
| Week 11 | 438,174.00 |
| Week 12 | 438,174.00 |
| Week 13 | 438,174.00 |
| Week 14 | 438,174.00 |
| Week 15 | 438,174.00 |
| Week 16 | 438,174.00 |
| Week 17 | 438,174.00 |
| Completion | 438,174.00 |
| Total | 16,381,740.00 |

The Mobilization Payment shall be paid to Agent no later than 5:00 pm CST on the day following contract execution.

Subject to the payment terms and conditions agreed to in writing by Agent and 1031 Canal Development, LLC, the weekly installments specified above (1 -17) shall be paid to Agent no later than 12:00 pm CST on the Friday of each week following the Commencement Date..

Subject to the payment terms and conditions agreed to in writing by Agent and 1031 Canal Development, LLC, the Implosion Milestone payment shall be paid no later than 5:00 pm CST on the third business day following the date Contractor confirms that either: 1) all the explosive charges in the Hard Rock Building have fully detonated; or 2) the date all explosive charges that have not fully detonated have either been removed from the Hard Rock Building or otherwise deemed rendered safe, whichever is later.

{N3952870.4}                                    1

Final payment shall be due not later than the third business day following the date Contractor has confirmed Completion as defined in the Agreement.  For purposes of this Agreement, "Completion" means that the Scope of Work has been completed in accordance with the Contract Documents.

Subject to the payment terms and conditions agreed to in writing by Agent and 1031 Canal Development, LLC, in the event any payment is not received when due, or in the event 1031 Canal Development, LLC fails to escrow contract funds as required, Agent may cease Work until the payment and/or escrow funds are received.

Extra Work shall be billed separately, with payment due seven (7) days following invoicing.  Extra work shall be billed on a Time and Material basis per the rates set forth in Exhibit E.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**EXHIBIT D TO EMERGENCY PUBLIC WORKS AGREEMENT**

**IMMUNITY AND INDEMNITY EXCEPTIONS**

Notwithstanding any provision of the Emergency Public Works Agreement or any applicable law to the contrary, Agent shall not have immunity under La. R.S. 29:735, nor shall Agent be entitled to indemnity by the State, with respect to Claims by property owners of, and owners of businesses operating at, the following municipal addresses:

1101, 1111, 1113, 1115, and 1117 Canal Street a/k/a the Saenger Theatre;

1001, 1005, 1011 and 1015 Canal Street;

1000, 1008, 1012, 1024, 1028, 1030, and 1036 Canal Street;

1000 Iberville Street (McCrory's building);

1001 Iberville Street (ground parking lot); and,

200 N. Rampart Street (parking deck).

Agent agrees, for the benefit of property owners and owners of businesses operating at the above-listed municipal addresses, that Agent shall be liable for all damages sustained or losses incurred by such property or business owners adjudicated to have been caused by the negligence in the performance of the Scope of Work (Exhibit B) by Agent and/or its subagents under this Agreement.  Agent shall not be liable for damages sustained or losses incurred by such property or business owners prior to the date the Hard Rock Building is demolished by controlled demolition using explosive charges.

Notwithstanding any provision of the Emergency Public Works Agreement or any applicable law to the contrary, including, but not limited to Exhibit A, Section 12.2, the State shall save, defend, indemnify, and hold harmless Agent and/or its subagents from and against any Claims asserted on behalf of Quinnyon Wimberly and/or Jose Ponce Arreola (the "Decedents"), or members of their families, including but not limited to, spouses, children, parents, brothers, sisters, and grandparents,.arising out of the performance of the Scope of Work while the Decedents' remains are trapped within the Hard Rock Building.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**



# D. H. GRIFFIN WRECKING CO., INC.

4716 Hilltop Road, Greensboro, NC 27407

## DEMOLITION AND DISMANTLEMENT LABOR RATES
EFFECTIVE JANUARY 1, 2020 THROUGH JANUARY 1, 2021

| CLASSIFICATION | STRAIGHT TIME | OVERTIME | SUNDAYS & HOLIDAYS |
|---|---|---|---|
| Corporate Manager | $450.00 per hour | $675.00 per hour | $810.00 per hour |
| Division Manager | $300.00 per hour | $450.00 per hour | $540.00 per hour |
| Project Manager | $190.00 per hour | $285.00 per hour | $342.00 per hour |
| Project Supervisor/Asbestos Supervisor | $145.00 per hour | $218.00 per hour | $261.00 per hour |
| Safety Officer | $125.00 per hour | $123.00 per hour | $225.00 per hour |
| Operator (Crane & Loader/ Excavator) | $75.00 per hour | $113.00 per hour | $135.00 per hour |
| Equipment Mechanic | $75.00 per hour | $113.00 per hour | $135.00 per hour |
| High Burner/Skilled Labor/Asbestos Worker | $70.00 per hour | $105.00 per hour | $126.00 per hour |
| Truck Driver | $60.00 per hour | $90.00 per hour | $108.00 per hour |
| General Laborers | $50.00 per hour | $75.00 per hour | $90.00 per hour |
| Administrative | $40.00 per hour | $60.00 per hour | $72.00 per hour |
| 65-ft Long Arm Komatsu PC 300 | $500.50 per hour | | |
| 95-ft Long Arm CAT 345 | $500.00 per hour | | |
| 120-ft Long Arm CAT 365 | $700.50 per hour | | |
| Komatsu PC800 Long Arm | $1,000.00 per hour | | |
| Komatsu 300 Shear/Pulverizer/Hammer | $425.00 per hour | | |
| Komatsu 490 Shear/Pulverizer/Hammer | $500.00 per hour | | |
| Komatsu 600 Shear/Pulverizer/Hammer | $600.00 per hour | | |
| Komatsu 800 Shear/Pulverizer/Hammer | $700.00 per hour | | |
| Komatsu 290 Grapple/Bucket | $250.00 per hour | | |
| Komatsu PC 300 Grapple/Bucket | $300.00 per hour | | |
| Komatsu 490 Grapple/Bucket | $350.00 per hour | | |
| Komatsu 600 Grapple/Bucket | $425.00 per hour | | |
| Komatsu 800 Grapple/Bucket | $500.00 per hour | | |
| Komatsu 1250 Shear/Grapple/Bucket | $900.00 per hour | | |
| 963 Track Loader | $225.00 per hour | | |
| 980 Wheel Loader | $250.00 per hour | | |
| Road Tractors & Dump Trailers | $150.00 per hour | | |
| Dump Trucks | $115.00 per hour | | |
| Articulating Off Road Trucks | $300.00 per hour | | |
| Skid Steer Loaders w/ Grapple Buckets | $80.00 per hour | | |
| Equipment Mobilization | Cost + 15% | | |
| Fuel for Equipment | Cost + 15% | | |
| Truck and Hand tools | $150.00 per day | | |
| 70 KW Mobile Generator | $125.00 per day | | |
| Dust Boss Mobile Mist DB2 | $300.00 per day | | |
| Demolition Debris Transport and Disposal | Cost + 15% | | |
| Materials and Consumables | Cost + 15% | | |
| Permitting | Cost + 15% | | |
| Third Party Air Monitoring/Asbestos Design | Cost + 15% | | |
| Third Party Subcontractors | Cost + 15% | | |
| Third Party Rental Equipment | Cost + 15% | | |
| Per Diem/Lodging Charge | $200.00 per employee per day | | |

- All pricing is based on a standard 40-hour work week. Overtime (Straight Time plus 50%) is billed for all hours over 40-hour week and for Saturday work. Sundays and Holidays are billed at Straight Time plus 80%.
- Minimum daily charge is eight (8) hours per employee per day.
- Minimum daily charge is eight (8) hours per piece of equipment per day.
- PPE, draft tools, and safety materials, consumables and fuel are not included in the above hourly rate.
- All Equipment Rates are for Equipment only and do not include Operators.
- All costs will be billed Portal to Portal – travel time will be billed at the billing rate.
- All equipment mobilization will be billed at cost plus 15%.

**EXHIBIT F TO EMERGENCY PUBLIC WORKS AGREEMENT**

**SITE PROPERTY LEGAL DESCRIPTIONS**

## 1031 Canal Street:

A CERTAIN PIECE OR PORTION OF GROUND, TOGETHER WITH ALL THE BUILDING AND IMPROVEMENTS THEREON, AND ALL OF THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF ORLEANS, SECOND DISTRICT, SQUARE 95, BOUNDED BY CANAL STREET, N. RAMPART STREET, IBERVILLE STREET AND BURGUNDY STREET, DESIGNATED AS LOT A-1, AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF CANAL STREET AND THE EASTERLY RIGHT OF WAY LINE OF N RAMPART STREET, MEASURE. THENCE ALONG SAID EASTERLY LINE IN A NORTHERLY DIRECTION ON AN INTERIOR ANGLE OF 90°02'20", A DISTANCE OF 321 FEET 0 INCHES AND 0 LINES TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF IBERVILLE STREET; MEASURE THENCE ALONG SAID SOUTHERLY LINE IN AN EASTERLY DIRECTION ON AN INTERIOR ANGLE OF 89°57'40", A DISTANCE OF 129 FEET 8 INCHES AND 2 LINES TO A POINT; MEASURE THENCE IN A SOUTHERLY DIRECTION ON AN INTERIOR ANGLE OF 90°02'20", A DISTANCE OF 128 FEET 0 INCHES AND 0 LINES TO A POINT; MEASURE THENCE IN AN EASTERLY DIRECTION ON AN INTERIOR ANGLE OF 269°57'40", A DISTANCE OF 32 FEET 5 INCHES AND 2 LINES TO A POINT; MEASURE THENCE IN A SOUTHERLY DIRECTION ON AN INTERIOR ANGLE OF 90°02'20", A DISTANCE OF 29 FEET 6 INCHES AND 0 LINES TO A POINT; MEASURE THENCE IN AN EASTERLY DIRECTION ON AN INTERIOR ANGLE OF 269°57'40", A DISTANCE OF 0 FEET 7 INCHES AND 0 LINES TO A POINT; MEASURE THENCE IN A SOUTHERLY DIRECTION ON AN INTERIOR ANGLE OF 90°02'20", A DISTANCE OF 35 FEET 7 INCHES AND 3 LINES TO A POINT; MEASURE THENCE IN A WESTERLY DIRECTION ON AN INTERIOR ANGLE OF 89°57'40", A DISTANCE OF 58 FEET 11 INCHES AND 2 LINES TO A POINT; MEASURE THENCE IN A SOUTHERLY DIRECTION ON AN INTERIOR ANGLE OF 270°02'20", A DISTANCE OF 127 FEET 10 INCHES AND 5 LINES TO A POINT ON THE NORTHERLY RIGHT OF WAY LINE OF CANAL STREET; MEASURE THENCE ALONG SAID NORTHERLY LINE IN A WESTERLY DIRECTION ON AN INTERIOR ANGLE OF 89°57'40", A DISTANCE OF 103 FEET 9 INCHES AND 2 LINES TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF N RAMPART STREET, THE POINT OF BEGINNING.

THIS DESCRIPTION IS BASED ON A SURVEY BY RICHMOND W. KREBS DATED AUGUST 14, 2017, RECERTIFIED DECEMBER 20, 2017 AND DESIGNATED AS JOB# 171912.

## 1027 Canal Street:

A CERTAIN LOT OF GROUND, together with all the buildings a d improvements thereon, rights, ways and advantages thereunto belonging or in anywise appertaining, having a municipal address of 1027 Canal Street, New Orleans, Louisiana 70112, situated, lying and being in the Second District of the City of New Orleans, State of Louisiana, in the Square bound by Canal, Rampart,

Customhouse (Iberville) and Burgundy Streets, measuring twenty-six feet (26') front on Canal Street by one hundred and twenty-eight feet (128') in depth between parallel lines d designated by the Number One on a plan drawn on the 17th day of February, 1831, annexed to an act of sale from N. Morse to Wm. H. Chase, passed before Wm. H. Christy, late a Notary Public in this City on the 19th day of February, 1831 (the "Property").

## 1019-25 Canal Street:

A certain lot of ground, with the buildings and improvements thereon and all the appurtenances thereunto belonging, situated in the Second District o the City of New Orleans, Louisiana, designated by the No. Six, in Square No. 95, bounded by Canal, Burgundy, N. Rampart, Iberville (late Customhouse) Streets, measuring sixty-four feet, eleven inches and five lines front on Canal Street, the same width in the rear, by a depth of one hundred twenty-eight feet, two inches and two lines, between equal and parallel lines, all as per sketch of survey made by C. Uncas Lewis, Surveyor, dated December 29, 1919, annexed to an act passed before William J. Guste, Notary Public, on January 9th, 1920, and as survey by Guy Seghers, dated November 30, 1949, redated October 28, 1955, a copy of which is annexed to an act before Agnes S. Hung, Notary Public, dated November 2, 1955 said lot of ground be ins at a point of 130'3"6" ' from the corner of Canal and N. Rampart Street and measures 65'1"2"' front on Canal Street, thence at an angle towards Iberville Street of 127'10"5"', thence in direction of N. Rampart Street, a distance of 65'5"0" th nce on an angle of 89°57'20" in the direction of Canal Street, a distance of 127'10"5 " to the point of beginning.

Improvements are designated as Municipal Nos. 1019-25 Canal Street.

## 1022 Iberville Street:

THAT PORTION OF GROUND, together with all the buildings and improvements thereon, and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Second District of the City of New Orleans, State of Louisiana, in the Square No. 95, bounded by Iberville, N. Rampart, Canal and Burgundy Streets; designated by the No. 53, on a sketch of survey made by E. L. Eustis, Deputy City Surveyor, dated June 15, 1923, and measures according thereto; from a point of 127 feet 10 inches and 6 lines from the corner of Burgundy and Iberville Streets 63 feet 11 inches and 3 lines front on Iberville Street, by a first depth on the side line towards Burgundy Street of 105 feet 10 inches 5 lines, thence on a line parallel with Iberville Street running in the direction of North Rampart Street, 1 foot and 5 lines; then a further depth on the side line towards Burgundy Street 22 feet with a width in the rear of 62 feet 10 inches and 6 lines and a depth on the other side line of 127 feet 10 inches and 5 lines; and also described as a certain parcel of ground situated in Square 95 on Customhouse, now Iberville Street, between Burgundy and Rampart Streets bounded on one side by the property formerly belonging to John Hall and on the other side by the property formerly belonging to John Greeves, and measuring in French measure 60 feet front on Customhouse, now Iberville Street by 120 feet in depth and being designated by the No. 53 on a plan made by John

Tatnesse, Surveyor, on October 8, 1816, deposited in the Office of M. DeAnnas, late Notary, by act dated November 14, 1816.

That portion of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated on the City of New Orleans, State of Louisiana, in the Second District in Square No. 95, bounded by Burgundy, Canal, North Rampart and Iberville Street, designated by the letter "Y" on a sketch by E. L. Eustis, Deputy City Surveyor, dated June 15, 1923, annexed to an act of G. A. Llambias, N.P., dated July 12, 1923, according to which sketch said piece or portion of ground begins at a distance of 128 feet 11 inches and 3 lines from the Burgundy Street line of property above described and measures on a continuation of that line 33 feet and 1 line, running parallel to Iberville Street, by 65 feet and 4 lines, between equal and parallel lines and 33 feet and 1 line in width in the rear, running parallel to Canal Street and forms the rear portions of Lots designated on said sketch as Lots "A" and "B".

The two above described tracts, according to a survey of Guy Seghers, Surveyor, dated November 30, 1949, and redated October 28, 1955, (copy of which is attached to act before Agnes S. Hunt, notary public of New York, New York, contained in an act of deposit of Sale of Property by W.T. Grant Company to The Guardian Life Insurance Company of America executed before Wood Brown, Notary Public of the Parish of Orleans, on December 8, 1955) begin at a point on Iberville Street 129'9"0"' from the corner of Iberville and North Rampart Streets; thence in the direction of Canal Street a distance of 127'11"; thence, parallel with the Iberville Street, in the direction of Burgundy Street, a distance of 31'9"6"; thence in the direction of Canal Street, on an exterior angle of 91°3'34", a distance of 65'3"2"; thence, in the direction of Burgundy Street and parallel to Iberville Street, a distance of 32'6"0"'; thence in the direction of Iberville Street a distance of 193'2"2"' to a point on Iberville Street 130'3"4" from the corner of Iberville and Burgundy Street; thence along Iberville Street in the direction of Rampart Street, a distance of 64'4"2" to the point of beginning.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

March ___, 2020

1031 Canal Development, LLC                    1022 Iberville, LLC
1025 Canal Development, LLC                    1208 Bert Street
Canaux, LLC                                    Laplace, Louisiana 70068
3525 N. Causeway Blvd., Ste. 1040
Metairie, Louisiana 70002

Citadel Builders, LLC
3516 Hessmer Avenue
Metairie, LA 70002

   *Re:* *Hard Rock Hotel Project*
     <u>*Letter Agreement for Demolition*</u>

   Pursuant to the authority vested in the Office of the Governor by La. Rev. Stat. § 29:721 *et seq.*, and in furtherance of the State of Emergency initially declared on October 18, 2019 as a result of the partial collapse of the hotel construction project located at 1031 Canal Street in New Orleans, Louisiana, and based on the advice of engineers and other professionals on site, I find that the partially collapsed building located at 1031 Canal Street poses an imminent threat of further collapse and must be taken down immediately, together with the surrounding buildings located at 1019-1025 Canal Street, 1027 Canal Street and 1022 Iberville Street (collectively, the "Buildings").   With the cooperation of 1031 Canal Development, LLC, 1025 Canal Development, LLC, Canaux, LLC and 1022 Iberville, LLC (collectively, the "Property Owners") and Citadel Builders, LLC,and conditioned upon their legally binding agreements set forth in this letter, the State of Louisiana engaged a demolition contractor to demolish the Buildings in accordance with an Emergency Public Works Agreement dated this date (the "Demolition"). Independent of the findings of the State and its Governor, the Property Owners recognize and agree that the Buildings must be taken down, and that the Demolition is the most appropriate means of doing so.

   Each of the Property Owners and Citadel Builders, LLC hereby (1) consents to entry onto the project site by the State's contractors for purposes of carrying out the Demolition; and (2) waives any claims it may have against the State of Louisiana and the City of New Orleans, arising from or in connection with the Demolition.

   1031 Canal Development, LLC and Citadel Builders, LLC further agrees to defend and indemnify the State of Louisiana and the City of New Orleans for any liability, responsibility, costs or reasonable, out-of-pocket expenses incurred in connection with any claims threatened or asserted against any of them by any third parties and arising from or in connection with the

Demolition, including, without limitation, reasonable, out-of-pocket attorneys' fee and costs incurred in connection with any such claims.

Each of the other Property Owners agrees to defend and indemnify the State of Louisiana and the City of New Orleans for any liability, responsibility, costs or expenses incurred in connection with any claims threatened or asserted against any of them by any third parties and arising from or in connection with the portion of the Demolition that pertains to the property owned by such Property Owner, including, without limitation, attorneys' fee and other costs incurred in connection with any such claims. Notwithstanding the foregoing, the State of Louisiana and the City of New Orleans agree to use best efforts to pursue defense and indemnity under the insurance described in section 12 of the Emergency Public Works Agreement before demanding defense and indemnity hereunder.

1031 Canal Development, LLC agrees to pay to the City of New Orleans all reasonable amounts incurred for police department, fire department and other services provided by the City of New Orleans to clear a safe zone and otherwise facilitate the Demolition. 1031 Canal Development, LLC further agrees to instruct its insurer to pay directly to the City of New Orleans all amounts owed pursuant to this paragraph.

It is recognized that, except as set forth in this letter agreement and the Emergency Public Works Agreement, the Property Owners and Citadel Builders, LLC are reserving all rights afforded by law. Neither the Demolition nor this letter agreement shall be construed as a waiver of any claims by the State against any of the Property Owners and Citadel Builders, LLCv

Yours truly,

STATE OF LOUISIANA

By: John Bel Edwards
Governor

[SIGNATURE PAGE TO FOLLOW]

Accepted and Agreed:

_____
1031 Canal Development, LLC
By:  Chandra Mohan Kailas


_____
Canaux, LLC
By:  Chandra Mohan Kailas


Accepted and Agreed:

_____
Citadel Builders, LLC
By:  Denzel L. Clark


Accepted and Agreed:

_____
1025 Canal Development, LLC
By:  Chandra Mohan Kailas


_____
1022 Iberville, LLC
By:  Todd Trosclair