## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| D.H. GRIFFIN WRECKING COMPANY, INC. | CIVIL ACTION 20-CV-01051-EEF-DMD |
| Plaintiff, | |
| v. | |
| 1031 CANAL DEVELOPMENT, L.L.C. | |
| Defendant. | |

### DEFENDANT 1031 CANAL DEVELOPMENT, L.L.C.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

NOW INTO COURT comes Defendant 1031 Canal Development, L.L.C. ("1031 Canal" or "Defendant"), which in response to the Court's May 29, 2020 Order submits the following Amended Answer, Affirmative Defenses, and Counterclaims in response to the Complaint for Declaratory Judgment filed by Plaintiff D.H. Griffin Wrecking Company, Inc. ("Griffin"):

### INTRODUCTORY STATEMENT

1031 Canal adopts in full the Introductory Statement from its April 1, 2020 Answer, Affirmative Defenses, and Counterclaims (Doc. 5).

### ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT

Now comes Defendant, which responds to the Complaint for Declaratory Judgment (Doc. 1) as follows:

### Parties

1.  Paragraph 1 is denied for lack of information.

2.  Defendant admits that it is a limited liability company organized under the laws of Delaware and that the sole member of Defendant is 1031 Canal Mezzanine, LLC, which

is a limited liability company organized under the laws of Delaware. Defendant further admits that none of the members of 1031 Mezzanine are citizens of North Carolina. Defendant further admits that it has designated a principal business establishment in Louisiana.

### Jurisdiction and Venue

3. Paragraph 3 asserts legal conclusions to which no response is required from Defendant.

4. Paragraph 4 asserts legal conclusions to which no response is required from Defendant.

5. Paragraph 5 asserts legal conclusions to which no response is required from Defendant.

### Relevant Factual Background

6. Paragraph 6 is admitted.

7. Defendant admits that the Hard Rock Project that was under construction partially collapsed on or about October 12, 2019. Except as expressly admitted, the remaining allegations of Paragraph 7 are denied.

8. Defendant admits that two tower cranes were damaged as part of the partial collapse that occurred on or about October 12, 2019. Except as expressly admitted, the remaining allegations of Paragraph 8 are denied.

9. Defendant admits that on October 18, 2019, the Governor of Louisiana, John Bel Edwards, issued a Proclamation bearing number 161 JBE 2019 and that the Proclamation, as a written document, is the best evidence of its contents.

10. Defendant admits that on October 18, 2019, the State of Louisiana executed an Emergency Public Works Agreement with Griffin and Lemoine Disaster Recovery, L.L.C. ("Lemoine") and that the Emergency Public Works Agreement, as a written document, is the best evidence of its contents.

1536730v.1

11. Responding to Paragraph 11, Defendant responds that any such agreement is a written document and as such is the best evidence of its contents.

12. Paragraph 12 is denied.

13. Defendant admits that it pursued options other than Griffin for demolishing the Hard Rock Project. Except as expressly admitted, the allegations of Paragraph 13 are denied as written.

14. Responding to Paragraph 14, Defendant admits that Richard Lafayette is a representative of its builders risk insurer. Defendant denies the assertion that at least two demolition plans offered by 1031 Canal were deemed unacceptable by the City of New Orleans. The remaining allegations of Paragraph 14 are denied for lack of information.

15. Paragraph 15 is admitted.

16. Defendant admits that the Memorandum of Understanding is a written document and as such is the best evidence of its contents. Further responding, Defendant denies Paragraph 16 to the extent Griffin asserts that the Memorandum of Understanding was not a binding agreement.

17. Defendant admits that the Memorandum of Understanding is a written document and as such is the best evidence of its contents. Further responding, Defendant denies Paragraph 17 to the extent Griffin asserts that the Memorandum of Understanding was not a binding agreement.

18. The second sentence of Paragraph 18 is denied for lack of information. Responding to the first sentence of Paragraph 18, Defendant admits that the Memorandum of Understanding is a written document and as such is the best evidence of its contents.

19. Defendant admits that the Memorandum of Understanding is a written document and as such is the best evidence of its contents. Further responding, Defendant denies Paragraph 19 to the extent Griffin asserts that the Memorandum of Understanding was not a binding agreement.

20. Responding to Paragraph 20, Defendant admits that no document was executed on January 21, 2020. Except as expressly admitted, the allegations of Paragraph 20 are denied. Defendant specifically denies any assertion by Griffin in Paragraph 20 that the Memorandum of Understanding was not a binding agreement.

21. Paragraph 21 is denied for lack of information.

22. Paragraph 22 is denied for lack of information.

23. Responding to Paragraph 23, Defendant admits that the referenced correspondence is a written document and as such is the best evidence of its contents. Further responding, Defendant specifically denies Paragraph 23 to the extent Griffin asserts that the Memorandum of Understanding was not a binding agreement.

24. Responding to Paragraph 24, Defendant admits that the referenced correspondence is a written document and as such is the best evidence of its contents. Further responding, Defendant specifically denies Paragraph 24 to the extent Griffin asserts that the Memorandum of Understanding was not a binding agreement.

25. Defendant denies Paragraph 25.

**Cause of Action**
**Count One – Declaratory Judgment**

26. Paragraph 26 requires no response from Defendant.

27. Defendant denies Paragraph 27. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

28. Defendant denies Paragraph 28. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

### Jury Demand

29. Paragraph 29 requires no response from Defendant.

### Prayer for Relief

30. Paragraph 30 requires no response from Defendant. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

31. Paragraph 31 requires no response from Defendant. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

32. Paragraph 32 requires no response from Defendant. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

33. Paragraph 33 requires no response from Defendant. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

1536730v.1

34. Paragraph 34 requires no response from Defendant. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

35. The un-numbered WHEREFORE paragraph following paragraph 34 of the Complaint for Declaratory Judgment requires no response from Defendant. Further responding, Defendant denies that Plaintiff is entitled to any relief whatsoever, including the relief demanded, if any, against Defendant in this paragraph.

## AFFIRMATIVE DEFENSES

Further responding, Defendant asserts the following affirmative defenses to Plaintiff's Complaint for Declaratory Judgment:

### First Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of unclean hands, ratification, estoppel, and/or waiver.

### Second Affirmative Defense

Plaintiff's claims are barred by fraud, and Defendant makes an affirmative claim for fees as a result. In support of this affirmative defense, Defendant pleads as follows:

1. In the negotiations preceding and leading to the execution of the Binding Memorandum in January 2020, Griffin made misrepresentations with respect to its abilities and intentions for pricing, insurance, communications, and engineering.

2. Specifically, Griffin represented that it would (1) provide all services "for a turnkey price of $15,650,000.00" as "the total price and not subject to change for any unforeseen conditions or change in scope"); (2) "provide $50 million (fifty million dollars) of liability insurance dedicated to the Project" from a carrier with a rating of A10 or better

6

and with 1031 Canal and its related entities being included as additional named insureds; (3) include 1031 Canal as a "party to all communication between the Demolition Team and any government, municipal, quasi-governmental, state, or city authority"; and (4) provide all engineering to 1031 Canal.

3. Griffin's representations were false in that (1) the price Griffin ultimately insisted on charging was significantly in excess of the $15,650,000 included in the Binding Memorandum; (2) Griffin did not have the ability and/or intent to procure $50 million in insurance; (3) Griffin had no intention of including 1031 Canal as a party to all communications with the City and State; and (4) Griffin has not provided the necessary engineering.

4. Upon information and belief, Griffin knew at the time it made the above-referenced misrepresentations that the representations were false.

5. Upon information and belief, Griffin intended to obtain an unjust advantage and/or to cause a loss or inconvenience to 1031 Canal, including to convince 1031 Canal to acquiesce to the City's ongoing pressure and demand that 1031 Canal contract with Griffin and implode the Building and to capitalize on its belief that, based on the costs and political pressure associated with the passage of time, 1031 Canal would have no choice but to move forward with Griffin after Griffin's misrepresentations came to light.

6. As a result of Griffin's misrepresentations, 1031 Canal has been damaged, including by incurring additional security expenses and other delay damages, and is entitled to attorneys' fees, costs, and interest.

## Third Affirmative Defense

Defendant affirmatively avers that Plaintiff is not entitled to any legal, equitable, or other

relief from Defendant.

### Fourth Affirmative Defense

Defendant specifically denies that Plaintiff is able to present evidence sufficient to support a claim under any applicable law and specifically puts Plaintiff to its proof as to each and every element necessary to support its claims.

### Fifth Affirmative Defense

Defendant reserves the right to assert additional affirmative defenses to the extent needed at any time prior to trial in this matter.

### AMENDED COUNTERCLAIMS

And now, assuming the position of Counterclaim-Plaintiff, 1031 Canal Development, L.L.C. asserts the following Counterclaims against Plaintiff:

### Parties

1. Counterclaim-Plaintiff 1031 Canal is a limited liability company organized under the laws of Delaware and doing business in Louisiana.

2. Counterclaim-Defendant Griffin is a corporation organized in and under the laws of the State of North Carolina.

### Jurisdiction and Venue

3. Jurisdiction in this Court is based on 28 U.S.C. §§ 1332 and 1367.

4. Venue is proper in this Court based on 28 U.S.C. §§ 1391(b)(2).

### Factual Allegations

5. This suit concerns the misrepresentations and unfair trade practices undertaken by Griffin in an effort to mislead and coerce 1031 Canal into awarding certain demolition contracts to Griffin.

8

6. 1031 Canal is the owner of certain property bearing municipal address 1031 Canal Street, New Orleans, Louisiana 70112 on which a project referred to as the Hard Rock Hotel and Residences was to be constructed (the "Building").

7. On or about October 12, 2019, the upper floors of the Building that were under construction partially collapsed. All further work on the Building was suspended as of that date. Two tower cranes on or adjacent to the Building were damaged as part of the partial collapse.

8. Following the partial collapse, the Governor of Louisiana issued a proclamation declaring a state of emergency with respect to the partial collapse, and the City assumed control over the Building, including with respect to whether any demolition could proceed.

9. Griffin was on-site in New Orleans within twenty-four hours of the partial collapse, and within days contacted 1031 Canal and various officials of the City of New Orleans with an offer to implode the two damaged tower cranes.

10. 1031 Canal faced tremendous public and political pressure from the City of New Orleans and the State of Louisiana, as well as from the public at large, to undertake measures to demolish the two damaged tower cranes.

11. Griffin at first proposed to demolish the two tower cranes for $750,000 and, after a few days, raised the proposed price to $1.25 million. However, when Griffin realized it could obtain an undue advantage by exploiting the Governor's emergency declaration and the political and public pressure being imposed on 1031 Canal, Griffin raised its price for demolition of the two cranes to $5 million. The increase in price from $1.25 million represented an increase of 300% within twenty-four hours.

12. In addition, the original offer of $750,000 included an industry-standard profit margin. Consequently, the increase of $4.25 million consisted entirely of additional profit for Griffin.

13. 1031 Canal had no practical choice but to agree to Griffin's price-gouging: both the City of New Orleans and the State of Louisiana were demanding that immediate action be taken with respect to the cranes, and, as Griffin understood, there was no room for delay to find another contractor. 1031 Canal therefore acquiesced to Griffin's terms under duress.

14. Griffin undertook to implode the cranes. Despite promising that the cranes would be totally demolished such that the entire crane infrastructure could be removed from the Building's site, Griffin did not meet expectations and only completed a partial demolition of the two damaged tower cranes. One crane remains speared into Rampart Street, and the other hangs over Canal Street.

15. Even more, 1031 Canal learned that Griffin's procedure for the crane implosion was unnecessary: despite Griffin's representations to the contrary, including assertions that alternative methods of demolishing the cranes could turn the cranes into projectiles, the cranes could have been removed as part of a larger implosion or other comprehensive demolition plan for the Building.

16. In fact, Griffin changed its position (and cast doubt on) on the need for imploding the cranes while planning discussions were ongoing. When Griffin's business prospects were limited to the crane implosion, Griffin insisted that the cranes needed to be imploded immediately. When those prospects improved to potentially being named the contractor for the broader demolition, Griffin similarly changed its opinion to state that an

immediate, separate crane implosion was unnecessary and that the cranes could be encompassed into the larger demolition with a longer timeframe. Griffin's inconsistency was pointed out to the City before the cranes were imploded, but the City nonetheless forged ahead.

17. Ultimately, 1031 Canal concluded that Griffin used its superior knowledge to take advantage of 1031 Canal and the City's relative lack of sophistication with respect to demolitions—which in turn allowed Griffin to gain a foothold in discussions for the larger contract to demolish the Building.

18. In any event, the practical effect of Griffin's price-gouging was that 1031 Canal spent $5 million under duress on an unsatisfactory and unnecessary crane implosion.

19. After the crane implosion—and realizing that Griffin, as a price-gouging contractor that failed to deliver on its promises, was not the preferred contractor for any future demolition work—1031 Canal began seeking proposals from other contractors to demolish the remainder of the Building.

20. 1031 Canal began working with another contractor to develop a demolition plan for the Building and, through its discussions with that contractor, determined that the Building should be demolished in a conventional—i.e., piecemeal—manner rather than through implosion, largely because of safety considerations.

21. Notwithstanding the conclusions with respect to, and efforts towards confecting, a conventional demolition plan, the City of New Orleans continued to meet with Griffin (upon information and belief, at Griffin's insistence) to craft an implosion plan for the Building. 1031 Canal was not aware of the City's meetings with Griffin at the time the meetings occurred.

11

22. In January 2020, 1031 Canal was informed that Griffin had been in contact with the City and with a representative of one of 1031 Canal's insurers and was further informed that the City wanted—which, given political pressure, meant the City was requiring—1031 Canal to participate in discussions with Griffin concerning an implosion of the Building.

23. 1031 Canal acceded to the City's demands, agreed to meet with Griffin and, in the second week of January 2020, worked with Griffin to craft an arrangement for demolition by implosion of the Building. As part of the discussions between 1031 Canal and Griffin, Griffin assured 1031 Canal that the implosion could be performed without damaging neighboring buildings.

24. 1031 Canal and Griffin negotiated and, on January 14, 2020, executed a document titled "Binding Memorandum of Understanding of Demolition (Project)" (the "Binding Memorandum") in which the parties agreed in relevant part as follows:

- Griffin would demolish the Building for a fixed price;

- Griffin would provide $50 million of insurance, which was understood to be the amount necessary to protect neighboring buildings and landowners from any potential damage caused by the implosion;

- Griffin would be working on behalf of 1031 Canal;

- 1031 Canal would be a party to all communications with the City and the State of Louisiana; and

- Griffin would provide all necessary engineering.

25. The Binding Memorandum was, as made clear by its terms and its label as a "Binding" Memorandum, understood by the parties to be a binding contract. The parties agreed that the exact scope of "services" would be formalized in a good-faith negotiation, but they expressly agreed that certain terms—including $50 million in insurance and a fixed price of $15,650,000—"shall" be provided. The binding nature of the "Binding" Memorandum

12

was expressly understood by everyone, including Griffin, to be a material inducement of 1031 Canal's consent, particularly because of Griffin's past actions and misrepresentations with respect to the crane implosion.

26. Upon information and belief, Griffin knew at the time it was negotiating with 1031 Canal to demolish the Building that its representations concerning its intentions with respect to pricing, insurance, communications with the City and State, and engineering were false. In particular, upon information and belief Griffin knew that (1) the price it would ultimately insist on charging would be significantly in excess of the $15,650,000 included in the Binding Memorandum; (2) Griffin did not have the ability and/or intent to procure $50 million in insurance; (3) Griffin had no intention of including 1031 Canal as a party to all communications with the City and State; and (4) Griffin would not provide all necessary engineering.

27. Upon information and belief, Griffin misrepresented its abilities and intentions with respect to pricing, insurance, communications, and engineering to convince 1031 Canal to acquiesce to the City's ongoing pressure and demand that 1031 Canal contract with Griffin and implode the Building. Griffin also is believed to have misrepresented its abilities and intentions because it expected, based on the costs and political pressure associated with the passage of time, 1031 Canal would have no choice but to move forward with Griffin after Griffin's misrepresentations came to light. In other words, Griffin was trying to lock 1031 Canal into using Griffin regardless of the Binding Memorandum and without regard to the ultimate terms of the deal.

28. After the parties executed the Binding Memorandum, discussions concerning the implosion continued for more than two months, with Griffin repeatedly misrepresenting its abilities, attempting to change agreed-upon terms, and circumventing 1031 Canal.

29. Notwithstanding the material changes imposed by Griffin, 1031 Canal responded to the continuing pressure from the City and executed a new contract with Griffin on March 6, 2020. (*See* Exhibit 1, March 6, 2020 Contract).

30. Griffin did not execute the new contract; rather, Griffin at the eleventh hour (1) drastically changed its requirements for immunity by demanding that the State provide full immunity for its explosives contractor and (2) alerted 1031 Canal, the City, and the State of Louisiana on March 18, 2020 that it would only be able to secure $22 million of insurance coverage (of the $50 million required by contract) and would need a substantial amount of additional money (between $3 million and $4 million) to procure the limited coverage.

31. On March 24, 2020, 1031 Canal informed Griffin that 1031 Canal could not move forward with Griffin as the contractor because of the grossly inadequate amount of insurance offered by Griffin.

32. Notwithstanding the notice on March 24, 2020, Griffin has continued to interfere with 1031 Canal's efforts to move forward with alternate demolition plans. Upon information and belief, Griffin continues to lobby government officials to require 1031 Canal to agree to an under-insured demolition contract to Griffin.

33. Even more, there is no conceivable reason that the City would continue to support a plan to implode the Building when the contractor proposing the implosion—Griffin—is under-insured by $28 million and has refused to share necessary engineering. But the City

14

nonetheless continues to pressure 1031 Canal into signing an implosion contract with Griffin—which ignores not only the desirability of a conventional demolition but also the pleas of neighboring landowners that the City prevent an under-insured implosion from moving forward.

34. Objectively, there is no rational basis for the City's continued support of Griffin.  One can only wonder why City officials or employees continue pressuring 1031 Canal to move forward with Griffin.

35. In an effort to curtail Griffin's unlawful practices, 1031 Canal submitted a cease-and-desist letter on March 28, 2020 demanding that Griffin stop interfering with 1031 Canal's efforts to secure an alternate demolition plan that did not include Griffin.

36. In the cease-and-desist letter, 1031 Canal also detailed certain damages that 1031 Canal had suffered as a result of Griffin's unfair and fraudulent acts, including:

- Over $4,000,000 in excessive costs associated with Griffin's price-gouging with respect to the crane implosion;

- Approximately $500,000 in site security costs incurred in the past three months while Griffin negotiated in bad faith; and

- Approximately $200,000 in legal fees incurred as a result of Griffin's bad-faith actions and fraud.

37. Griffin responded to the cease-and-desist letter by filing the above-captioned lawsuit, which is another component of Griffin's unfair and unlawful trade practices: by alleging that the Memorandum expressly labeled by the parties as "Binding" is "unenforceable, invalid, and . . . not a binding contract under Louisiana law," (Doc. 1) Griffin is transparently seeking to immunize itself from its past misrepresentations.

38. Ultimately, Griffin reneged on its agreement in the Binding Memorandum and otherwise engaged in misconduct while attempting to pressure 1031 Canal into using Griffin as a demolition contractor, including by:

- claiming it needed additional funds to obtain insurance coverage it agreed it would provide for a fixed price;

- reneging on its commitment to provide $50 million in insurance and instead agreed to provide only $22 million in coverage at a higher cost and thereby putting adjacent property owners in peril;

- asserting it would work for the State of Louisiana, with 1031 Canal's role relegated to paying Griffin for its work;

- repeatedly going behind and around 1031 Canal in its discussions with officials from the State and the City; and

- refusing to provide engineering plans to 1031 Canal (or indeed the State or City) to review.

39. 1031 Canal (and indeed the public interest) has been damaged by Griffin's months-long delay and misrepresentations, both through increased costs and an unnecessarily extended timeline for demolition of the Building.

## COUNT ONE:
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT

40. Counterclaim-Plaintiff incorporates and re-alleges each of the foregoing paragraphs as though set forth in full herein.

41. The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* LA. REV. STAT. § 51:1405(A).

42. As set forth above, Griffin has engaged in two unfair trade practices, one of which is ongoing: First, Griffin engaged in an unfair trade practice by price-gouging 1031 Canal with respect to the implosion of the cranes. Griffin knew that the crane implosion did not

16

need to be accomplished through a separate contract from the larger demolition but used its superior industry-specific knowledge to convince both the City and 1031 Canal that the crane implosion needed to be undertaken immediately, including by falsely asserting that the cranes could be turned into projectiles if they were demolished as part of a larger implosion. Then, when Griffin knew it would receive the contract, it took advantage of public and political pressure as well as the Governor's emergency declaration to increase the price for the implosion within twenty-four hours from a price of $1.25 million to $5,000,000—an increase of 300%, all of which was pure profit.

43. Second, Griffin engaged, and continues to engage, in an unfair trade practice to coerce (and now cover up its efforts to coerce) 1031 Canal into awarding Griffin the contract to demolish the Building, including by (1) misrepresenting key terms in the Binding Memorandum, (2) lobbying the City on an ongoing basis to demand that 1031 Canal award the contract to Griffin and implode the Building, and (3) filing and pursuing this lawsuit to have the Binding Memorandum declared "unenforceable, invalid, and . . . not a binding contract under Louisiana law."

44. Griffin's deceptive and fraudulent conduct has, in addition to harming its customer, harmed competition by (1) preventing 1031 Canal from securing services from other contractors on better terms and (2) chilling other contractors from coming forward with competitive bids to perform the demolition, including, among other reasons, because Griffin had already mobilized its equipment.

45. As a result of Griffin's unfair trade practices, 1031 Canal is entitled to an award of damages, plus costs, attorneys' fees, and interest.

1536730v.1

46. A copy of this Counterclaim is being provided to the Louisiana Attorney General, but Griffin's unfair trade practices—including especially the pursuit of the lawsuit and the efforts to interfere with awarding the demolition contract to any contractor other than Griffin—continue to this day.

47. As a result, in addition to the other damages, attorneys' fees, costs, and interest to which 1031 Canal is entitled, 1031 Canal is entitled to treble damages under Louisiana Revised Statutes § 51:1409(A).

## COUNT TWO:
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

48. Counterclaim-Plaintiff incorporates and re-alleges each of the foregoing paragraphs as though set forth in full herein.

49. To prevail on a claim for tortious interference with business relations, 1031 Canal must prove that Griffin: "(1) acted with actual malice; (2) actually prevented the plaintiff from dealing with a third party; (3) acted improperly, i.e., not to protect legitimate interests; and (4) caused damage to the plaintiff." (*See* Doc. 54 at 13 (internal quotations omitted) (citing *IberiaBank v. Broussard*, 907 F.3d 826, 841 (5th Cir. 2018)).

50. This claim seeks the damages, including but not limited to increased response costs, arising from the intentional interference by Griffin in 1031 Canal's efforts to move forward with Kolb Grading, L.L.C. ("Kolb") as demolition contractor.

51. The relevant period for this claim for damages begins on the date that 1031 Canal informed the City and Griffin that it no longer wanted to use Griffin as the demolition contractor and ends on the date that 1031 Canal finally obtained a demolition permit from the City.

18

52. During this period of time, Griffin is believed to have actively lobbied City officials in an effort to prevent the City from issuing a demolition permit to 1031 Canal, including by misrepresenting the need for or desirability of an implosion rather than a conventional demolition. The City's approval was needed for a permit, and Griffin's interference in 1031 Canal's efforts to obtain a permit actually prevented 1031 Canal from dealing with the City.

53. As set forth above, a conventional demolition was and remains a better choice for demolishing the Building, because a conventional demolition allows for better control of debris and damage and an enhanced opportunity to recover the victims' remains. Griffin, however, long advocated for demolishing the Building through an implosion; had staked its proposal to the City and 1031 Canal on demolishing the Building; and had cornered a relationship with one of only three explosives contractors in the country that had experience performing these types of implosions. Griffin is thus believed to have continued (for its own benefit) to press the City towards approving only an implosion based, upon other things, misleading assertions concerning the timeline to completion and the safety and effectiveness of an implosion.

54. Upon information and belief, Griffin was angered by 1031 Canal's decision to tell the City that it no longer wanted to move forward with Griffin as the contractor for the demolition of the Building. Griffin is thus believed to have communicated with the City to prevent the demolition of the Building from moving forward for an improper purpose: *i.e.*, out of spite in retaliation for 1031 Canal's decision not to move forward with Griffin.

55. Griffin's malice was further piqued by the fact that 1031 Canal was undermining Griffin's strategy of obtaining windfall profits from demolition of the Building. Griffin is

believed to have originally pressed for immediate demolition of the two tower cranes because it saw an opportunity to make a tremendous amount of money. Indeed, Griffin's strategy of reaping tremendous, illegitimate profits for itself at the expense of 1031 Canal is a defining characteristic of the entire relationship between Griffin, 1031 Canal, and the City. When Griffin became aware that it could obtain its sought-after, unwarranted profits from demolishing the entire Building, Griffin backed away from its previous insistence that the tower cranes needed to be demolished immediately and maintained instead that the tower cranes could be included with a larger implosion. Those initial efforts to backtrack failed because of political and public pressure to remove the cranes immediately, but Griffin nonetheless remained determined to extract as much profit from its work on the Building as possible. When 1031 Canal rebuffed Griffin's plan by informing the City and Griffin that it no longer wanted to use Griffin as the demolition contractor, Griffin responded by retaliating against 1031 Canal out of malice and in an effort to punish 1031 Canal. Griffin's reaction was not motivated by a legitimate interest in protecting potential business, but was instead motivated by ill will and malice targeted specifically at 1031 Canal because of 1031 Canal's decision not to use Griffin.

56. Griffin was successful in interfering with 1031 Canal's efforts to deal with the City and Kolb. Upon information and belief, throughout March and April 2020, Griffin worked with City officials to erect obstacle after obstacle to 1031 Canal's application for a demolition permit, again because of Griffin's spiteful response to 1031 Canal's decision to use a different contractor. Further, Griffin refused to demobilize equipment from the site around the Building, which prevented demolition from moving forward and which jeopardized 1031 Canal's ability to obtain a permit and comply with an administrative

20

order from the City of New Orleans. Again, Griffin is believed to have undertaken these actions out of ill will and spite arising from 1031 Canal deciding not to move forward with Griffin.

57. Consequently, Griffin's conduct between the time 1031 Canal informed the City and Griffin that it did not want to use Griffin as the demolition contractor was motivated by ill will and spite and not motivated for the purpose of protecting legitimate interests. Griffin acted with actual malice and improperly, and it actually prevented 1031 Canal from dealing with the City (in obtaining a permit) and Kolb (in moving forward with the demolition). That period of delay further gave rise to damages, including but not limited to increased response costs (such as added site security, fuel costs for generators, and fencing and trailer rental expenses) which were caused by Griffin's tortious interference.

58. Griffin was and remains motivated by the prospect of windfall profits, ill will, and spite towards 1031 Canal and has never had any legitimate interest to protect in interfering with 1031 Canal's business relations.

59. 1031 Canal is entitled to all damages caused by Griffin's misconduct, as well as an award of interest and costs.

**COUNT THREE:**
**FRAUD**

60. Counterclaim-Plaintiff incorporates and re-alleges each of the foregoing paragraphs as though set forth in full herein.

61. In the negotiations preceding and leading to the execution of the Binding Memorandum in January 2020, Griffin made misrepresentations with respect to its abilities and intentions for pricing, insurance, communications, and engineering.

62. Specifically, Griffin represented that it would (1) provide all services "for a turnkey price of $15,650,000.00" as "the total price and not subject to change for any unforeseen conditions or change in scope"; (2) "provide $50 million (fifty million dollars) of liability insurance dedicated to the Project" from a carrier with a rating of A10 or better and with 1031 Canal and its related entities being included as additional named insureds; (3) include 1031 Canal as a "party to all communication between the Demolition Team and any government, municipal, quasi-governmental, state, or city authority"; and (4) provide all engineering to 1031 Canal.

63. Griffin's representations were false, including in that (1) the price Griffin ultimately insisted on charging was significantly in excess of the $15,650,000 included in the Binding Memorandum; (2) Griffin did not have the ability and/or intent to procure $50 million in insurance; (3) Griffin had no intention of including 1031 Canal as a party to all communications with the City and State; and (4) Griffin has not provided the necessary engineering.

64. Upon information and belief, Griffin knew at the time it made the above-referenced misrepresentations that the representations were false.

65. Upon information and belief, Griffin intended to obtain an unjust advantage and/or to cause a loss or inconvenience to 1031 Canal, including to convince 1031 Canal to acquiesce to the City's ongoing pressure and demand that 1031 Canal contract with Griffin and implode the Building and to capitalize on its belief that, based on the costs and political pressure associated with the passage of time, 1031 Canal would have no choice but to move forward with Griffin after Griffin's misrepresentations came to light.

66. As a result of Griffin's misrepresentations, 1031 Canal has been damaged, including by incurring additional security expenses and other delay damages.

1031 Canal is entitled to recover all damages resulting from Griffin's fraudulent misrepresentations as well as costs, interest, and attorneys' fees.

## COUNT FOUR:
## BREACH OF CONTRACT, INCLUDING BREACH OF THE DUTY OF GOOD FAITH
## AND FAIR DEALING, AS TO BINDING MEMORANDUM

67. Counterclaim-Plaintiff incorporates and re-alleges each of the foregoing paragraphs as though set forth in full herein.

68. The Binding Memorandum is an enforceable contract between 1031 Canal and Griffin.

69. Griffin breached its obligations under the Binding Memorandum by, among other actions:

- claiming it needed additional funds to obtain the agreed-upon $50 million in insurance coverage

- claiming it needed substantial additional funds (between $3 million and $3.5 million) to obtain a mere $22 million in coverage;

- asserting it would work for the State of Louisiana, with 1031 Canal's role relegated to paying Griffin for its work;

- repeatedly going behind and around 1031 Canal in its discussions with officials from the State and the City; and

- refusing to provide engineering plans to 1031 Canal (or indeed the State or City) to review.

70. 1031 Canal has been damaged by Griffin's breaches of the Binding Memorandum and is therefore entitled to recover all resulting damages, as well as costs and interest.

71. Further, Griffin breached its obligations in bad faith because, among other reasons, Griffin intended to coerce 1031 Canal into accepting a more-expensive and less-desirable arrangement for demolishing the Building than was originally set forth in the Binding

23

Memorandum, just as Griffin coerced 1031 Canal into accepting the onerous terms with respect to imploding the two damaged tower cranes.

72. Because Griffin's breaches were in bad faith, 1031 Canal is entitled to an award of all resulting damages, whether foreseeable or not, as well as an award of costs and interest.

73. Finally, and in the alternative, to the extent the obligation to negotiate in the Binding Memorandum was anything more than an agreement to set forth with greater particularity the exact scope of the "services" to be performed, Griffin failed to perform such obligation.

74. In particular, and in the alternative, Griffin failed to negotiate in good faith and instead sought, as with the implosion of the tower cranes, to compel 1031 Canal to accept onerous and undesirable terms for demolition of the Building.

75. Griffin's bad faith has damaged 1031 Canal, including with respect to increased security costs and other delay damages.

76. Consequently, 1031 Canal is entitled in the alternative to all damages resulting from Griffin's failure to perform any obligation to negotiate in good faith, as well as an award of interest and costs.

## COUNT FIVE:
## DETRIMENTAL RELIANCE

77. Counterclaim-Plaintiff incorporates and re-alleges each of the foregoing paragraphs as though set forth in full herein.

78. In the alternative to the claim for breach of contract, 1031 Canal is entitled to recover against Griffin based on 1031 Canal's detrimental reliance on Griffin's representations.

79. On or about January 14, 2020, Griffin represented to 1031 Canal that Griffin would (1) provide all services "for a turnkey price of $15,650,000.00" as "the total price and not

24

subject to change for any unforeseen conditions or change in scope"; (2) "provide $50 million (fifty million dollars) of liability insurance dedicated to the Project" from a carrier with a rating of A10 or better and with 1031 Canal and its related entities being included as additional named insureds; (3) include 1031 Canal as a "party to all communication between the Demolition Team and any government, municipal, quasi-governmental, state, or city authority"; and (4) provide all engineering to 1031 Canal.

80. 1031 Canal relied on Griffin's representations by failing to move forward with a contract to demolish the Building with Kolb or another contractor.

81. Had 1031 Canal known that Griffin would not perform in accordance with the Binding Memorandum, 1031 Canal would have moved forward with securing a demolition contract with Kolb or another contractor.

82. 1031 Canal was justified in relying on Griffin's representations because, among other reasons, Griffin set forth its representations in a document agreed by the parties to be a "binding" memorandum of understanding and because Griffin otherwise assured 1031 Canal of its willingness and ability to perform.

83. In the alternative to the claim for breach of contract, 1031 Canal is entitled to an award of damages, costs, and interest as a result of its detrimental reliance on Griffin's representations.

## COUNT SIX:
## ALTERNATIVE CLAIM FOR BREACH OF CONTRACT
## AS TO CRANE IMPLOSION CONTRACT

84. Counterclaim-Plaintiff incorporates and re-alleges each of the foregoing paragraphs as though set forth in full herein.

85. In the alternative to 1031 Canal's duress claim, Griffin breached its obligations under the contract to implode the two damaged tower cranes.

86. In particular, Griffin had an obligation to complete the demolition of the two damaged tower cranes. The parties' expectations with respect to the thoroughness and skill with which Griffin would fulfill its obligations under the crane-implosion contract were enhanced based upon the exorbitant and unfair price charged by Griffin.

87. Griffin failed to perform its obligation to complete the demolition of the two damaged tower cranes, particularly in light of the exorbitant and unfair price charged by Griffin.

88. Griffin's failure to perform has damaged 1031 Canal, including because the cranes have not been completely demolished.

89. In the alternative to the claim for duress, 1031 Canal is entitled to an award of all damages, costs, and interest as a result of Griffin's failure to perform under the crane-implosion contract.

## JURY DEMAND

1031 Canal demands a jury on all issues triable by a jury.

## PRAYER FOR RELIEF

**WHEREFORE,** 1031 Canal Development, L.L.C. asks that this Court deem these Counterclaims good and sufficient and that, after due proceedings are had, this Court enter a Judgment in favor of 1031 Canal and against Griffin as follows:

1)  denying all relief requested by Griffin;

2)  awarding all damages against Griffin to which 1031 Canal is entitled, including but not limited to treble damages under the LUTPA;

3)  awarding 1031 Canal reasonable attorneys' fees;

1536730v.1

4) awarding 1031 Canal pre-judgment and post-judgment interest and costs; and

5) awarding any other relief to which 1031 Canal is legally entitled.

Respectfully submitted,

*/s/ Kerry Miller*

Kerry Miller, 24562
Paul Thibodeaux, 29446
Michael Dodson, 37450
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

*Attorneys for 1031 Canal Development, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Kerry Miller*

27