## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **D. H. GRIFFIN WRECKING COMPANY, INC.**<br><br>**versus**<br><br>**1031 CANAL DEVELOPMENT, LLC** | **CIVIL ACTION NO. 20-cv-01051**<br><br>**SECTION "L" (3)**<br><br>**JUDGE ELDON E. FALLON**<br><br>**MAG. JUDGE DANA DOUGLAS**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

D. H. Griffin Wrecking Company, Inc. ("D.H. Griffin"), through undersigned counsel, respectfully files this Amended Complaint and avers as follows:

## INTRODUCTORY STATEMENT

On March 28, 2020, 1031 Canal Development, LLC ("1031") sent a letter demanding that D.H. Griffin cease and desist from unspecified "unfair and deceptive methods in connection with 1031 Canal's attempts to demolish the building located at 1031 Canal St., New Orleans." The letter further accused D.H. Griffin of "price gouging" in connection with the demolition of two failed construction cranes, and breach of obligations set forth in a "Binding Memorandum of Understanding of Demolition (Project)" ("Memorandum of Understanding" or "MOU").

In response, D.H. Griffin commenced the instant action seeking a declaratory judgment that the Memorandum of Understanding was not an enforceable contract under Louisiana law. Thereafter, 1031 filed a Counterclaim that embodies the kitchen sink approach to pleading.[1] The

---

[1] ECF 5.

facial invalidity of the Counterclaim was the subject of a Motion to Dismiss by D.H. Griffin,[2] which was granted in part and denied in part by this Court.[3]

Beyond its facial deficiencies, the Counterclaim is substantively specious and clearly being presented for an improper purpose, namely, to harass D.H. Griffin, inflict reputational damage, and use the cost of litigation to extort a *post hoc* reduction of the crane demolition price. For example, 1031 asserts its defamatory "price gouging" claim notwithstanding the fact that 1031, with full knowledge of the crane demolition price, entered into a letter agreement with the State that expressly "waive[d] any claims they may have against the State of Louisiana ***and its contractors***, and the City of New Orleans, arising from or in connection with the Crane Demolition." Importantly, and as discussed below, the remainder of 1031's claims have no basis in fact and are not reasonably based on the evidence that was available to 1031 at the time the Counterclaim was filed, and are part of 1031's scheme to inflict harm on D.H. Griffin.

## PARTIES

1.      Plaintiff, D.H. Griffin, is a North Carolina corporation with its domicile and principal place of business in Greensboro, North Carolina. D.H. Griffin is licensed to do business within the State of Louisiana, and within the jurisdiction of this Honorable Court.

2.      Defendant, 1031 Canal Development, LLC ("1031"), is a limited liability company organized under the laws of Delaware, with a principal place of business in Louisiana. The sole member of 1031 is 1031 Mezzanine, LLC ("1031 Mezzanine"), which is a limited liability company organized under the laws of Delaware. None of the members of 1031 Mezzanine are citizens of North Carolina.

---

[2] ECF 44.

[3] ECF 54.

3.      Defendant, Richard Lafayette, is a person of full majority domiciled in the State of Georgia.

4.      Defendant, Crawford Global Technical Services ("Crawford") is a corporation organized under the laws of Georgia, with its principal place of business in Georgia.

5.      Defendant, Stephen I. Dwyer, is a person of full majority domiciled in the State of Louisiana.

6.      Defendant, Mohan C. Kailas, is a person of full majority domiciled in the State of Louisiana

7.      Defendant, National Fire & Marine Insurance Company, an affiliate of National Indemnity Company and Berkshire Hathaway Specialty Insurance ("National"), is, upon information and belief, the builders risk insurer for 1031, and is organized under the laws of Nebraska, with its principal place of business in Nebraska.

## JURISDICTION AND VENUE

8.      This is a matter brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, as it involves a case of actual controversy, and D.H. Griffin requests that the Court declare the rights and other legal relations between it and Defendant 1031.

9.      This matter is also brought pursuant to 28 U.S.C. § 1332.

A.      Plaintiff, D.H. Griffin, is a citizen of North Carolina.

B.      The citizenship of an LLC is determined by the citizenship of its members.  None of the members of Defendant 1031 are citizens of North Carolina.

C.      Defendant, Richard Lafayette, is a citizen of Georgia.

D.      Defendant, Crawford & Company ("Crawford Global Technical Services"), is a citizen of Georgia.

E.      Defendant, Stephen I. Dwyer, is a citizen of Louisiana.

F.      Defendant, Mohan C. Kailas, is a citizen of Louisiana

G.      Defendant, National, is, a citizen of Nebraska.

Accordingly, the requirements for subject matter jurisdiction based on diversity of citizenship are met.

10.     Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claim occurred in the Eastern District of Louisiana.

## RELEVANT FACTUAL BACKGROUND

11.     Defendant 1031 is the owner of a project to construct a Hard Rock Hotel at 1031 Canal Street, New Orleans, Louisiana (the "Hard Rock Project").  Citadel Builders, LLC ("Citadel"), was the general contractor for the project.

12.     On October 12, 2019, the top ten stories of the then eighteen story Hard Rock Hotel (the "Building") partially collapsed, causing the death of three people, with countless others being injured.  As of the date of this pleading, the partially-collapsed building largely still stands, essentially untouched since mid-October, with the remains of two decedents still trapped inside.

13.     In the collapse, two tower cranes used in the construction were severely damaged. The crane closest to Canal Street, code named "Alpha," was knocked off the base securing it to the ground by the force of the collapse.  The building collapse caused the crane closest to Iberville Street, code named "Charlie," to lean approximately 8 feet to the north and 2 feet to the west, past its center of gravity.

14.     The building collapse caused deformation of the supporting masts of both cranes, which were in imminent danger of falling uncontrolled, constituting a threat to both life and property.  More specifically, an uncontrolled fall of the cranes imperiled both the Saenger Theatre, as well as the water, gas, and electric utilities for the French Quarter.

15.     On October 12, 2019, D.H. Griffin was contacted by Lemoine Disaster Recovery,

L.L.C. ("Lemoine"), a contractor based in Lafayette, Louisiana, inquiring about the availability of specialized equipment that might be used in the disaster assistance effort.

16.     Representatives of D.H. Griffin arrived in Louisiana after the collapse, on the morning of October 13, 2019.

17.     Initially, several options were considered with respect to bringing down the cranes, including mechanical disassembly, using mobile cranes to "pick" the crane boom assemblies from atop the masts, and stabilizing the cranes by anchoring them to the Building.

18.     One of the options under consideration was explosive demolition of the cranes. On October 14, 2019, D.H. Griffin contacted Controlled Demolition, Inc. ("CDI"), a specialty explosives contractor, to determine whether explosives could be used to lower the damaged cranes and mitigate the risk to persons and adjacent properties of uncontrolled collapse of one or both cranes.

19.     CDI arrived in New Orleans late in the evening on October 14, 2019.

20.     The crane owner inspected the cranes on October 14, 2019, and reported the following morning that "both cranes are considered failed" and that "[a]t this condition we do not have a method of securing or dismantling the cranes."

21.     In its Plan & Procedure For The Demolition Of The Alpha And Charlie Tower Cranes dated October 18, 2019, CDI explained the intent of the implosion as follows:

> TT [Thornton Tomasetti, Inc.] has advised against tethering any portion of the mast to the Hard Rock Hotel building for reasons of safety of personnel due to the structurally failed conditions of the cranes. As a result, when CDI uses explosives to release the boom and counterweights of the cranes and severs the mast of each crane just below the Hard Rock Hotel roof elevation, there will be little control over the fall of the mast section during the lowering sequence. The primary goal is to have the counterweights fall within the demolition site and to have the booms impact the roof of the Hard Rock Hotel structure toward limiting impact on adjacent improvements.

22.     On October 17, 2019, the City of New Orleans (the "City"), which 1031 admits "had assumed control over the Building, including with respect to whether any demolition could proceed,"[4] decided that the cranes should be demolished using explosives.

23.     Discussions over the crane demolition contract occurred the afternoon of October 17, 2019, with the City and State of Louisiana (the "State") initially taking the position that the demolition contract needed to be between D.H. Griffin and the project owner, 1031.

24.     The demolition team—D.H. Griffin, CDI, and Thornton Tomasetti, Inc. ("Thornton Tomasetti" or "TTI")—uniformly took the position the crane demolition contract had to be between D.H. Griffin and the State, because only the State could grant the demolition team immunity under the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721, *et seq.* ("Disaster Act").  The Disaster Act further enabled the State to waive the anti-indemnity provisions of the Public Works Act, and indemnify the demolition team against claims arising out of the crane implosion.

25.     In the late afternoon of October 17, 2019, Thornton Tomasetti raised concerns over whether the crane demolition might cause further collapse of the Building, and submitted for consideration the question of whether it would be better to wait a few weeks and explosively demolish the cranes and the Building in a single implosion.

26.     Thornton Tomasetti's suggestion of delaying the crane demolition resulted in the City convening an emergency meeting including 1031, Citadel, D.H. Griffin, TTI, CDI, the Mayor, and other City officials, at which the Mayor emphatically, forcefully, and unequivocally stated that the cranes needed to come down without delay.   1031's representatives, Denise Gaines and Stephen Dwyer, were present when the Mayor made this pronouncement.

---

[4] ECF 5 at 12, ¶ 8.

27.     At 12:29 a.m. on October 18, 2019, D.H. Griffin sent to the City and the State a proposed "Emergency Public Works Agreement" for the demolition of the cranes.  1031 did not participate in the drafting of this "Emergency Public Works Agreement," and was not sent a copy of the draft agreement.

28.     In fact, because it was not a party to the "Emergency Public Works Agreement," 1031 did not receive a copy of the agreement until the State circulated a final version at 1:41 p.m. on October 18, 2019.[5]

29.     Under the October 18, 2019 "Emergency Public Works Agreement," the State engaged D.H. Griffin and Lemoine to demolish the two construction cranes for a lump sum price of Five Million Dollars ($5,000,000.00).  D.H. Griffin and Lemoine were given immunity and complete indemnity by the State against claims for personal injury, death, and property damage arising out of the crane demolition.

30.     Under the October 18, 2019 "Emergency Public Works Agreement," D.H. Griffin and Lemoine undertook the following obligations with respect to the demolition of the two failed cranes:

> *All supervision, labor, and equipment required to build, install, and shoot explosive charges on the 2 damaged tower cranes in an effort to bring about a controlled demolition of the tower cranes and decrease the danger presented by their present condition and location, in accordance with Section 10 of the Terms and Conditions (Exhibit A).* This scope of work includes all work done or contemplated under the Services Contract between the City of New Orleans and D.H. Griffin Wrecking Co., Inc., executed on or about October 16, 2019, and D.H. Griffin Wrecking Co., Inc. hereby agrees that that Services Contract is null and void and waives any right to payment or other claims under that Services Contract.
>
> *Agent shall not be responsible for the results of the blasting operation and will use its best efforts to achieve the desired results. After the charges are shot for the 2 cranes they will remain as is until the final building demolition work is*

---

[5] October 18, 2019, 1:41 PM Email by Matthew Block, with attachment, attached as Exhibit 1.

*commenced under a separate contract at a future date.*

October 18, 2019 "Emergency Public Works Agreement," Exhibit B, Scope of Work (emphasis added).

31.     Section 10 of Exhibit A to the October 18, 2019 "Emergency Public Works Agreement," Terms and Conditions, stated:

> Agent's work shall be complete upon the detonation of the explosive charges that will be affixed to the tower cranes at the Site in an attempt to bring about a controlled demolition of the tower cranes. In the event that any of the explosive charges do not fully detonate, Agent will either resume Work to fully detonate the explosives or to remove any explosives that have not fully detonated.

32.     Contrary to 1031's false claim,[6] the October 18, 2019 "Emergency Public Works Agreement" is the only contract that exists for the demolition of the two failed cranes.

33.     On October 18, 2019, the Governor of Louisiana, John Bel Edwards, issued a Proclamation (No. 161 JBE 2019) declaring a state of emergency, ordering that the two damaged cranes from the building collapse be brought down immediately for the safety and welfare of the inhabitants of the affected area.

34.     In the early morning of October 18, 2019, 1031 submitted to the State the draft of a separate "letter agreement" between the State, 1031, and Citadel with respect to the demolition of the failed tower cranes (the "Letter Agreement").

35.     The Letter Agreement was executed on the afternoon of October 18, 2019, and 1031 circulated the copy it signed ***after*** it received the executed "Emergency Public Works Agreement"—*i.e.*, after it knew the agreed-to contract price and the agreed-to scope of work.[7]   In

---

[6] ECF 45 at 3.

[7] October 18, 2019, 1:48 PM Email by Matthew Block, with attachment, October 18, 2019, 2:03 PM email by Amanda Dawson, with attachment, and October 18, 2019, 2:18 PM email by Benjamin Janke, with attachment, attached as Exhibit 2, *in globo*.

the Letter Agreement, 1031:

- "recognize[d] and agree[d] that the cranes must be taken down, and that the Crane Demolition is the most appropriate means of doing so."

- ***"waive[d] any claims they may have against*** the State of ***Louisiana and its contractors,*** and the City of New Orleans, ***arising from or in connection with the Crane Demolition."***

- "agree[d] to defend and indemnify the State of Louisiana and its contractors, and the City of New Orleans, for any liability, responsibility, costs or expenses incurred in connection with any claims threatened or asserted against any of them by any third parties and arising from or in connection with the Crane Demolition, including, without limitation, attorneys' fees and other costs incurred in connection with any such claims."[8]

The Letter Agreement defined "Crane Demolition" as the "engage[ment of] a demolition contractor to demolish the two construction cranes in accordance with an Emergency Public Works Agreement dated this date."

36.     After the October 18, 2019 "Emergency Public Works Agreement," was executed by D.H. Griffin and the State, the City came to the realization that D.H. Griffin's obligations ended with the detonation of the explosives or removal of any explosives that had not fully detonated. The City then requested, and the State and D.H. Griffin agreed, that Exhibit B of the Agreement (the Scope of Work) would be amended to include "up to eight (8) hours to clean/clear the streets for one block in each direction immediately adjacent to the site (*i.e.*, Canal Street and Rampart Street)."[9]

37.     The tower cranes were successfully lowered with explosives on Sunday, October 20, 2019.  Following the implosion the City held a press conference at which New Orleans Fire Superintendent Timothy McConnell said "I do not think it could have gone much better," and that

---

[8] *Id* (emphasis added).

[9] *See* ECF 44-2.

"It went down exactly as we expected it to do."[10]

38.     At no time prior to the October 20, 2019 implosion did D.H. Griffin or Lemoine have any discussions with 1031 regarding the contract for the demolition of the cranes, or the expected results of the implosion.  In fact, D.H. Griffin did not meet the principals of 1031—Mohan Kailas, Praveen Kailas, and Naveen Kailas—until January 2020.

39.     On October 21, 2019, the Mayor held a press conference regarding the Hard Rock Hotel.  During that conference, Fire Superintendent Timothy McConnell reiterated that "it [the crane implosion] could not have gone any better.  It went as planned."[11]

40.     D.H. Griffin's first direct communication with 1031 occurred on October 23, 2019, when D.H. Griffin was contacted by Tom Clutter.  Because Mr. Clutter was not known to D.H. Griffin, it requested that he "send your full contact information and who you are representing." Mr. Clutter identified himself as "Owner Representative for 1031."

41.     D.H. Griffin demobilized from the Hard Rock Hotel site on October 24, 2019.

42.     Notwithstanding its now professed belief that D.H. Griffin was "price gouging" on the Crane Demolition, 1031 requested that D.H. Griffin submit possible pricing scenarios for: (a) removal of the tower cranes in their current condition; (b) taking down and removing the Building structure from the roof to the 8th floor transfer slab; and (c) taking down the entire Building structure to the ground and removing it.

43.     On October 27, 2019, Denzel Clark, the President of Citadel, contacted CDI to determine the circumstances under which CDI would be willing to demolish the Building. CDI

---

[10] *See* https://www.nola.com/news/article_3621281a-f2ec-11e9-80de-37c04f0ba1fc.html

[11] *See*  https://www.fox8live.com/2019/10/21/city-official-give-update-hard-rock-crane-implosion-recovery/

advised Clark that it would be willing to work with the same demolition team under an extension of the emergency agreement with the State and directed Clark to contact D.H. Griffin, the team lead on the project.

44.     On October 30, 2019, D.H. Griffin, at Citadel's request, submitted a proposal dated October 29, 2019, for the demolition and removal of the then-stabilized cranes and the remaining Building for the sum of $16,488,000.

45.     On November 4, 2019, D.H. Griffin withdrew the October 29, 2019, proposal because it had expired by its terms.  Later that same day D.H. Griffin submitted a new proposal, dated November 4, 2019, to Citadel for demolition and removal of the then-stabilized cranes and the remaining Building, again for the sum of $16,488,000 (the "November 4, 2019, Proposal").

46.     The November 4, 2019, Proposal contained the following "Bid Specific Conditions:"

•       Proposal is contingent on the parties negotiating the terms and conditions of a written contract acceptable to DHGW.

•       Proposal is contingent on DHGW and its team members receiving acceptable immunity and indemnity.

•       Proposal is contingent on guaranteed funding acceptable to DHGW.

47.     On November 8, 2019, at the request of 1031 and Citadel, D.H. Griffin submitted to 1031 and Citadel a proposal for implosion of the Building only (*i.e.*, no post-implosion debris removal) in the amount of $8,250,000 (the "November 8, 2019, Proposal").

48.     The November 8, 2019, Proposal contained the following "Bid Specific Conditions:"

•       Proposal is contingent on the parties negotiating the terms and conditions of a written contract acceptable to DHGW.

•       Proposal is contingent on DHGW and its team members receiving

acceptable immunity and indemnity.

•     Proposal is contingent on guaranteed funding acceptable to DHGW.

49.     Four days later, on November 12, 2019, 1031, without the courtesy of an advance communication to D.H. Griffin, 1031 issued a public statement indicating that it was "finalizing a comprehensive and safe plan, in conjunction with the City of New Orleans and other agencies, for the implosion of the building. ***Multiple engineers have advised that the safest method of demolition is implosion.***"[12]  1031 further stated that it had "retained the services of the highly recognized firm, Kolb Grading LLC and its affiliate Dem/Tech, for the demolition of the building."[13]

50.     The following day, November 13, 2019, WWL TV reported that the company selected for the explosives work, Dem-Tech, was fined by the State of California for safety violations in connection with the August 2013 explosive demolition of a Pacific Gas & Electric power plant in Bakersfield, California.[14]

51.     On November 19, 2019, Ashlee Peno and Michael Mahaney, two engineers employed by Special Inspections & Design of Collinsville, Illinois ("SID"), issued a report to Kolb Grading LLC ("Kolb") entitled "1031 Canal Street New Orleans Demolition Methods," which only addressed the demolition of the top ten floors of the Building—*i.e.*, the structural steel floors constructed atop the 8th floor "transfer slab."  The report recommend that these floor be removed

---

[12]  *See*  https://wgno.com/news/local/1031-canal-development-planning-demolition-of-collapsed-hard-rock-hotel/ (emphasis added).

[13] *Id.*

[14] *See* https://www.wwltv.com/article/news/local/orleans/hard-rock-demolition-company-has-had-previous-concerns/289-ed873c86-38b8-4ded-a662-3265ee0b0556.  The fines reportedly stemmed from the failure to obtain proper permits, to accurately determine the blast area, and to make sure everyone—including police officers—was out of the blast zone.

by conventional demolition.  At the time this report was authored, neither Ms. Peno, Mr. Mahaney, nor SID were licensed to practice engineering in the State of Louisiana.[15]

52.     On November 21, 2019, Ashlee Peno and Michael Mahaney of SID issued to Kolb a second report entitled "1031 Canal Street New Orleans Demolition Methods, Addendum 1 – Airblast & Dust," which concluded that sound waves from an implosion of the Building as a whole had the potential to cause damage to surrounding structures that the authors could not predict.  The report also concluded that implosion had the potential to release "fugitive particulate matter," but made no attempt to quantify the impact.  Again, at the time this report was authored, neither Ms. Peno, Mr. Mahaney, nor SID were licensed to practice engineering in the State of Louisiana.

53.     Armed with the SID report and addendum, on November 25, 2019, 1031 flip-flopped and requested that the City reconsider imploding the building.[16]  In connection with this request, 1031 issued a public statement indicating that "***engineering experts have concluded that a conventional demolition with stabilization will be the most prudent method to demolish the building***." (emphasis added).[17]

54.     As of December 6, 2019, 1031 still had not given the City a plan for the conventional demolition of the Building.  The plan under discussion, however, reportedly involved sending workers into the Building to shore up the collapsed floors (*i.e.,* "stabilization") so that the

---

[15] According to the website of the Louisiana Professional Engineering and Land Surveying Board, Mr. Mahaney is not licensed, Ms. Peno became licensed on December 19, 2019, and SID became licensed on January 4, 2020.

[16]     *See*     https://www.nola.com/news/business/article_f10f7986-0fdb-11ea-a18c-6b3056fa8815.html.

[17]     *See*     https://www.nola.com/news/article_383d2ece-1091-11ea-b7c7-07b1d2c9ab2c.html.

Building would be stable enough to dismantle "piece-by-piece."[18]

55.     According to the City, National "determined that Kolb was unable to demonstrate either that its team was qualified or that its plan was feasible and safe. Kolb attempted to modify its plan to address those concerns, but failed to submit a plan that could be approved as safe, and [National] ultimately refused to proceed with Kolb because Kolb's plan had become unsafe and too expensive."[19]

56.     At the request of Richard "Rich" Lafayette, an employee of Crawford Global Technical Services and a third-party representative of National, D.H. Griffin met with Mr. Lafayette, Mark Naessig, a consulting engineer retained by Lafayette and/or National, and  Fire Superintendent McConnell on December 30, 2019, in New Orleans.

57.     The purpose of the December 30 meeting was to determine D.H. Griffin's interest in becoming involved again in the demolition of the Building.

58.     On January 13, 2020, D.H. Griffin, TTI, and CDI met with Rich Lafayette, Mark Naessig, and representatives of 1031 to discuss business terms and conditions acceptable to D.H. Griffin, 1031, and National under which D.H. Griffin might undertake the demolition of the Hard Rock Hotel building using explosives.   Because of schedule conflicts, the meeting did not conclude that day and resumed on January 14.

59.      Praveen Kailas of 1031 arrived at the January 14 meeting with a pre-prepared document that was edited by him during the course of the meeting, ending with the "Binding

---

[18]     *See* https://www.nola.com/news/politics/article_9278bcce-1883-11ea-acfb-3b0f6594c56c.html.

[19] Mayor's Office Press Release dated April 22, 2020, Fact Sheet: Six Months of Delays by Hard Rock Site Owners.

Memorandum of Understanding of Demolition (Project)" ("Memorandum of Understanding").[20] In that meeting, Praveen Kailas described the document to D.H. Griffin as an outline intended to provide some talking points so that the parties could get closer to an agreement and all be on the same page.

60.     Neither Praveen Kailas, nor any other representative of 1031, nor any other attendee of the meeting, said anything that indicated the Memorandum of Understanding was intended to be a final, definitive, binding, and enforceable agreement.

61.     Because the MOU did not address multiple commercial terms found in construction/demolition contracts, D.H. Griffin understood the Memorandum of Understanding to solely be a framework for future discussions, not a binding contract, with subsequent good faith negotiations leading to contract documents for the implosion of the Building.

62.     The Memorandum of Understanding omitted key stakeholders whose input and agreement were necessary to arriving at a final contract for the demolition of the Building, including the State, the City, the owners of the so-called "Red Zone Buildings" adjacent to the Hard Rock Hotel, members of the demolition team, and project insurers.

63.     The complexity of the arrangement is reflected in the fact that the proposed demolition of the Building by D.H. Griffin involved at least four separate agreements:

A.     An Emergency Public Works Agreement between D.H. Griffin and the State, that, among other things, provided for the demolition pursuant to the Disaster Act and afforded immunity and indemnity to the demolition team of D.H. Griffin, CDI, and TTI.

B.     An Access and Funding Agreement between D.H. Griffin and 1031 that, among other things (1) gave D.H. Griffin permission to demolish the Building; (2) gave D.H. Griffin permission to demolish the Red Zone Buildings owned by other Kailas

---

[20] ECF 1-1.

entities; (3) established how the contract price would be paid; and (4) established terms for the advance escrow of the contract price.

C.     An Access Agreement that gave D.H. Griffin permission to demolish a Red Zone Building owned by an entity controlled by Todd Trosclair, a minority investor in 1031; and

D.     A Letter Agreement between 1031 and the Red Zone Building Owners, the State, and the City.

64.     In addition to omitting key actors, the Memorandum of Understanding also omitted key contractual terms, including, the mechanics of payment, how payments were to be funded, the terms of the project specific insurance, and other terms that D.H. Griffin requested at the meeting.

65.     The Memorandum of Understanding contained "terms" that were not within the power or control of either 1031 or D.H. Griffin to fulfill, or could not be performed.  For example,

A.      The Memorandum of Understanding provides that "[a]ny indemnity and/or immunity offered by any government agency for work occurring after January 14, 2020 shall be extended to the Owner Entities."  *Id., ¶* 4h.  As with the crane implosion, the "government agency" providing indemnity and immunity was the State of Louisiana, which later expressly rejected granting immunity to 1031.

B.     The Memorandum of Understanding further provided that 1031 would be a "named insured" under the project specific insurance procured by D.H. Griffin.  *Id.*, ¶ 4b. The insurers flatly rejected "named insured" status for 1031.

C.     The Memorandum of Understanding provided for the reconnection of utilities.  *Id.,* ¶ 1.c.i.  Under applicable codes, utilities cannot be connected to demolished buildings.

66.     Finally, while 1031's Counterclaim falsely asserts that the Memorandum of Understanding is a binding agreement between it and D.H. Griffin, during the subsequent contract negotiations 1031 did not treat it as such when it suited its interests.  For example,

A.     The Memorandum of Understanding provided that D.H. Griffin would work at the "exclusive direction" of 1031, *id.*, ¶ 7a, a provision that 1031 later requested be deleted from the contract because it was not qualified to provide direction.

B.     In late February 2020, 1031 requested multiple additions to the draft contracts that were not part of the Memorandum of Understanding, including, but not limited to, the Red Zone Building owners be named as additional insured on the project

specific insurance, requirements for the use of dust control and blast blankets, and implementation of an education plan for affected property owners.

67.     In reliance on 1031's representation that it intended to negotiate a contract in good faith, D.H. Griffin began to mobilize personnel, equipment, and subcontractors to New Orleans on or about January 20, 2020.

68.     Upon information and belief, 1031 was lukewarm, at best, to the prospect of D.H. Griffin undertaking the Building demolition because 1031 was angry about the demolition of the two failed tower cranes and the cost of the explosive demolition of the Building.  In particular, because the demolitions were funded out of the National builders risk policy, every dollar paid for demolition was a dollar that was unavailable for reconstruction of the failed Building, thus 1031's sole motivation was achieving the lowest cost demolition and it was angry about anything that could prevent this.

69.     Upon information and belief, Mohan Kailas was angry about the demolition of the two failed tower cranes and the cost of the explosive demolition of the Building, because as the person in control of 1031, he stood to personally benefit from the reconstruction of the failed Building.

70.     Following the signing of the Memorandum of Understanding, the City insisted that D.H. Griffin have "skin in the game" by agreeing that certain properties facing the Hard Rock Hotel be exempted from the immunity being granted by the State under the contract between the State and D.H. Griffin.  Because these buildings formed a "U" around the Hard Rock Hotel, they were colloquially referred to as the "Horseshoe."

71.     It was always D.H. Griffin's understanding that it would receive complete immunity and indemnity from the State for anything beyond the Horseshoe, which was described in drafts of contracts with the State.  D.H. Griffin sought project-specific liability insurance based

on potential exposure for damage to the Horseshoe, and immunity and indemnity outside the Horseshoe.

72.      Following the signing of the Memorandum of Understanding, D.H. Griffin worked diligently to negotiate the various contracts for the demolition of the Building.

73.      D.H. Griffin sent a draft Emergency Public Works Agreement ("EPWA") between D.H. Griffin and the State of Louisiana, and certain exhibits, to 1031 on January 17, 2020.

74.      1031 sent D.H. Griffin comments and revisions with respect to the EPWA and exhibits on January 20, 2020.

75.      D.H. Griffin responded to 1031's comments and revisions that same day, January 20, 2020, and also sent an initial draft of the Access and Funding Agreement between D.H. Griffin and 1031.

76.      D.H. Griffin and 1031 participated in a conference call regarding the draft contract documents on January 21, 2020, but the contract negotiations were not concluded as of that date.

77.      No "formalized" agreement between D.H. Griffin and 1031 was executed within seven (7) days of the execution of the Memorandum of Understanding as was contemplated therein (*i.e*., on or before January 21, 2020).

78.      Despite not reaching a formal agreement by January 21, 2020, D.H. Griffin voluntarily continued attempting in good faith to reach an agreement with 1031 and other stakeholders on each of the contractual details necessary to provide for explosive demolition of the Building.

79.      Between January 22, 2020, and January 30, 2020, D.H. Griffin exchanged multiple drafts of the EPWA with 1031, the State, and the City.  Indeed, over this period there were at least 13 exchanges of draft documents, comments, and revisions among the stakeholders.

80.     Based on communications with 1031, it was apparent that 1031 solicited input and comments on the draft contract documents from National, through Rich Lafayette.  Lafayette also requested information directly from D.H. Griffin.

81.     By January 30, 2020 D.H. Griffin had received a verbal commitment for $50 million of project-specific insurance for the Building demolition.

82.     The contract negotiations hit their first major snag on January 30, 2020, when the State announced it would not indemnify D.H. Griffin or anyone else under the EPWA.  D.H. Griffin immediately advised the State, the City, and 1031 that the withdrawal of indemnity would likely affect insurance coverage and cost.

83.     Between January 30 and February 13, 2020, D.H. Griffin had multiple communications, meetings, and telephone conferences with the City, State, and 1031 regarding the impact of the State's withdrawal of indemnity as well as defining the scope of coverage—*i.e.*, whether project-specific insurance would cover claims outside the Horseshoe.

84.     Initially, the City and State proposed that 1031 provide the primary indemnity with the State providing "secondary indemnity" in the event 1031 could not perform.  This proposal was unavailing because 1031, as a private actor could not indemnify D.H. Griffin given the Louisiana anti-indemnity statute, LSA-R.S. 9:2780.1.  Moreover, to the extent 1031 could even give indemnity, it would look to the project specific insurance for "funding" because of its "additional insured" status.

85.     The next gambit by the City and State was to offer indemnity outside the Horseshoe, but the State, which also had "additional insured" status under the project specific insurance procured by D.H. Griffin, would only have exposure once the coverage limit of the project specific insurance was exhausted—*i.e.*, like 1031, the State was looking to fund its indemnity obligations,

in the first instance, with the project specific insurance supplied by D.H. Griffin.

86.     Unbeknownst to D.H. Griffin, 1031, through Mohan Kailas, seized on the turmoil created by the State's withdrawal of indemnity, as a means to undermine D.H. Griffin's standing with the City and thereby coerce the City's acquiescence to a conventional demolition plan favored by 1031.  In a February 13, 2020 email, Mohan Kailas wrote the Mayor as follows:

> I am gravely concerned that Griffin has no intention of fulfilling his obligations that he committed to in the MOU dated 1/14/20. We have been working with him a month now and he is still saying he needs "a couple more days". We need to impose a deadline. This is getting ridiculous. "He is a professional contractor and there is no way it is taking this long to find insurance. I think it is prudent we begin working on what we do if he does not perform. When can we get together to determine the solution? We are available whenever you are.[21]

87.     In fact (and contrary to 1031's false Counterclaim assertions), the very day Mohan Kailas wrote his email, Griffin received an insurance quote for $50 million of project specific insurance, at a cost of $1,929,240.

88.     Prior to the State's refusal to grant full indemnity, D.H. Griffin's budgeted amount for the project specific insurance was $1,000,000, so the cost increase caused the second major snag in the contract negotiations, namely, who was going to absorb the added cost resulting from the State's refusal to grant full indemnity.  This issue was resolved on February 21, 2020, when 1031's builders risk insurer—National—agreed to fund an increase in the contract price to $16,281,740 (an increase of $534,240), with D.H. Griffin absorbing the remainder of the cost increase.

89.     With the resolution of the insurance issue, the exchange of draft contract documents between D.H. Griffin, 1031, the City, and the State resumed.

90.     On March 5, 2020, D.H. Griffin sent to the City, the State, and 1031 "current drafts"

---

[21] ECF 23-3.

of the EPWA and Exhibits A-C thereto.

91.     On March 6, 2020, 1031, through Stephen I. Dwyer, responded to this submission as follows:

> ***I have attached redlines to Rich's last turn of documents along with clean drafts.***
> The revisions are consistent with what the parties have previously discussed. My clients have executed the documents requiring their signatures and are prepared to move forward immediately and to place into the escrow account the necessary contract funds. The process of getting to this point has been laborious and time consuming. However, it is time for all to come together and bring this process to a conclusion. We request that these documents be executed by all required parties by the close of business today. There is no reason to delay and every reason to expeditiously move forward.[22]

Thus, Dwyer's March 6, 2020 e-mail transmitted "redlines"—documents containing "mark[ed] or highlight[ed] edited text, as with a red line, to distinguish it from unedited portions of a document"[23]—and "drafts" signed by Mohan C. Kailas to which no other stakeholder had agreed.

92.      On March 9, D.H. Griffin sent to the City, the State, and 1031 the "latest drafts" of the EPWA, Exhibits A – D thereto, the Access Funding Agreement, and Exhibits 1 and 2 thereto.

93.     Later that day, 1031 responded with comments on the drafts, with Dwyer requesting "an 'in person' meeting to discuss and resolve these open items" and listing eleven items for discussion.

94.     Further draft contract documents were exchanged among the parties on March 10, 11, 12, and 13, 2020.

95.     On March 16, 2020, Dwyer inquired as to the status of the execution copies of the contracts.

96.     "Execution copies" of the contract documents were sent out to the City, State and

---

[22] ECF 44-2 at 13 (emphasis added).

[23] The American Heritage Dictionary of the English Language, 5th Edition.

1031 on March 18, 2020.

97.     Notwithstanding the multiple drafts exchanged after March 6, 2020, 1031 and Dwyer have falsely claimed that the March 6, 2020 drafts inexplicably signed by Mohan Kailas are a "new contract," even though no other stakeholder had agreed to the documents signed by Kailas.  Upon information and belief, the signing of these drafts was part of 1031's scheme to undermine D.H. Griffin's standing with the City and thereby force the City's acquiescence to a conventional demolition plan favored by 1031.

98.     The third and final snag in the contract negotiations occurred when CDI rejected the pseudo-indemnity being offered by the State and insisted on full immunity and indemnity given its work with explosives, which carries strict liability under Louisiana law.

99.     While the State ultimately acceded to CDI's request, the fact that CDI was being treated differently by the State than other members of the demolition team raised red flags with the insurers, causing them to reassess both their willingness to underwrite the project and the cost of the insurance.

100.     On March 18, 2020, D.H. Griffin provided a status report on its efforts to procure project specific insurance.  After providing a chronology of events, the report stated as follows:

> So, where we stand right now is DHG has quotes for project specific insurance up to $12 million, with a premium cost of $4,456,649.25 and an SIR of $500,000 per occurrence.
>
> The broker is attempting to get quotes for excess coverage above the $12 million, and as soon as I have information to report on that I will.  As of this writing we do not know how close we can get to $50 million in coverage, or the total premium cost of such coverage.

Contrary to the false claims of 1031 and Dwyer, D.H. Griffin never stated that it was unable to obtain insurance.  The false narrative is a component part of 1031's scheme to undermine D.H. Griffin and coerce the City into accepting 1031's favored conventional demolition plan using

Kolb.

101.    1031 and National refused any increase in the contract price due to the increased cost of project-specific insurance.

102.    Not knowing that 1031 and National were scheming to "move on," D.H. Griffin, continued its efforts to procure insurance coverage.  On March 20, 2020, D.H. Griffin reported to the State, the City, and 1031 that it had secured an additional $10 million in coverage, bringing the total project specific insurance coverage to $22 million.

103.    On March 25, Dwyer emailed D.H. Griffin's counsel, stating:  "Mr. Griffin is unable to satisfy his prior commitments and continues to offer only $22,000,000 of coverage at an additional cost of $3,400,000. As I wrote yesterday, these terms are unacceptable both to 1031 Canal development, LLC and to its Builder's Risk insurer. Therefore, and at the suggestion of our insurer, we must move on."

104.    Upon information and belief, throughout the time when 1031 was supposed to be negotiating in good faith with D.H. Griffin, 1031 had never "move[d] on" from Kolb and was actively working to undermine D.H. Griffin's standing with the City and thereby force the City's acquiescence to a conventional demolition plan favored by 1031.  In addition to the February e-mail cited above, documents in the public record show that after contract negotiations with D.H. Griffin commenced, but before 1031 "move[d] on" from D.H. Griffin:

A.    Kolb's subcontractor, Marschel Wrecking, L.L.C. ("Marschel"), obtained insurance coverage for the conventional demolition of the Building (1/15/20)

B.    Marschel obtained a Louisiana contractor's license (2/10/2020).

C.    Marschel prepared and submitted a Dust Control Plan for conventional demolition (3/13/2020).

D.    Kolb submitted a proposal to 1031 for conventional demolition (3/19/2020).

E.    1031 signed a contract with Kolb for conventional demolition (3/20/2020).

F.   1031 sought the approval of its builders risk insurer—National—for Kolb's conventional demolition of the Building.

105.   The positions 1031 took in negotiations with D.H. Griffin differ significantly from those it agreed to with Kolb. These differences, on the same issues, demonstrate 1031 took the positions with D.H. Griffin in bad faith and in an attempt to prevent an agreement between it and D.H. Griffin for demolition of the Building. Such terms include, but are not limited to, the type and amount of insurance 1031 sought to require for the demolition and the cost 1031 and its insurer would pay if the demolition contractor was delayed with evidence preservation efforts during the demolition.

106.   At the request of the City, D.H. Griffin continued its efforts to procure commitments for project specific insurance. By April 7, 2020, D.H. Griffin had a quote for $32 million in coverage at a cost of $5,843,850.32. By April 9, 2020, D.H. Griffin had a quote for $52 million in coverage at a cost of $6,837,304.07.

## CAUSES OF ACTION

## COUNT ONE – DECLARATORY JUDGMENT

107.   Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

108.   D.H. Griffin contests and disputes the enforceability of the Memorandum of Understanding, which 1031 threatens to enforce in its Cease and Desist Letter.

109.   The Memorandum of Understanding is not a valid and enforceable contract under Louisiana law, and D.H. Griffin is entitled to a declaratory judgment that it cannot be held liable for breach of a non-existent contract.

110.   1031 is not entitled to recover damages arising from the breach of a non-existent contract, and D.H. Griffin is entitled to a declaratory judgment so stating.

## COUNT TWO – ALTERNATIVE CLAIM FOR BREACH OF OBLIGATION TO NEGOTIATE IN GOOD FAITH

111.    Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

112.    Alternatively, if the Memorandum of Understanding is held to be binding and enforceable, 1031 breached its obligation in the Memorandum of Understanding to undertake a good faith negotiation of the services described therein for potential demolition of the Building. 1031 was obligated by the Memorandum of Understanding to engage in a good faith negotiation of the services described therein within seven days.

113.    1031 failed to perform this obligation and breached this obligation by:

- simultaneously pursuing a contract with Kolb for the demolition of the Building;

- simultaneously negotiating a contract with Kolb for the demolition of the Building;

- simultaneously implicitly or expressly encouraging Kolb and its subcontractors and engineers to prepare to do business in Louisiana;

- simultaneously implicitly or expressly encouraging Kolb, and its subcontractors and engineers, to prepare documentation supporting a conventional demolition of the Building;

1031 did not negotiate in good faith to reach a binding agreement.  While it facially appeared to be negotiating with D.H. Griffin, it was actually actively pursuing conventional demolition with other contractors, and painting the negotiations with D.H. Griffin unfavorably with the City so that it could coerce the City into following 1031's favored course of action.  1031's actions were in bad faith and are based on nefarious motives, spite, and ill will, stemming from its anger about D.H. Griffin's demolition of the two failed tower cranes and the price D.H. Griffin sought to charge for the Building demolition.

114.    D.H. Griffin suffered damages as a result of 1031's failure to negotiate in good

faith, and as a result of 1031's bad faith negotiating tactics.  D.H. Griffin is entitled to all damages it suffered and will suffer in the future, whether foreseeable or not, because of 1031's breach of its obligation was in bad faith.  D.H. Griffin's damages include, but are not limited to, all of its costs and expenses related to negotiation of the Building demolition, and all costs and expenses related to preparation for the potential demolition of the Building, including those of its subcontractors preparing for the Building demolition, and the costs of defending 1031's allegations related to the Memorandum of Understanding and negotiations for demolition of the Building.  1031 is liable to D.H. Griffin for interest on these damages.

### COUNT THREE – LOUISIANA UNFAIR TRADE PRACTICES ACT

115.    Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

116.    The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).

117.    As set forth above, 1031 has engaged in the unfair and deceptive practices by

- misrepresenting to D.H. Griffin the nature of the Memorandum of Understanding;

- misrepresenting the nature of the Memorandum of Understanding to the City, State, and in this litigation;

- misrepresenting that it would engage in a good faith negotiation toward a "formalized" agreement;

- seeking to contract with Kolb for the demolition of the Building when it was engaged in negotiations with D.H. Griffin;

- negotiating a contract with Kolb for the demolition of the Building when it was engaged in negotiations with D.H. Griffin;

- negotiating a contract with Kolb for the demolition of the Building when it claims it has a binding, enforceable agreement with D.H. Griffin;

- implicitly or expressly encouraging Kolb  Grading, and its subcontractors and engineers, to qualify  to do business in Louisiana;

- implicitly or expressly encouraging Kolb, and its subcontractors and engineers, to prepare documentation supporting a conventional demolition, when it was engaged in negotiations with D.H. Griffin.

While 1031 represented it would engage in a good faith negotiation with D.H. Griffin, 1031 engaged in unfair and deceptive practices by suppressing the truth that it was simultaneously seeking to contract with Kolb.

118.    1031 engaged in the foregoing unfair and deceptive practices in order to obtain an unfair and unjust advantage for itself and to cause loss and inconvenience to D.H. Griffin.  1031's unfair and deceptive practices were made with the intention to cause loss and inconvenience to D.H. Griffin, and has actually caused loss to D.H. Griffin, including, but not limited to, wasted time and resources on negotiations that 1031 actively worked to make unsuccessful, and causing damage to D.H. Griffin's reputation and goodwill when 1031 attempted to paint D.H. Griffin in a bad light as part of its scheme to coerce the City into acquiescing to a conventional demolition favored by 1031.

119.    D.H. Griffin suffered damages as a result of 1031's unfair and deceptive practices, including, but not limited to, all of its costs and expenses related to negotiation of the Building demolition, the costs of the time spent by all D.H. Griffin employees related to negotiation of the Building demolition, all costs and expenses related to preparation for the potential demolition of the Building, including those of its subcontractors preparing for the Building demolition, and the costs of defending 1031's allegations related to the Memorandum of Understanding and negotiations for demolition of the Building.  1031 is liable for all damages suffered by D.H. Griffin, and for D.H. Griffin's attorneys' fees.  1031 is liable to D.H. Griffin for interest on these damages.

120.    Contemporaneous with the commencement of this claim, a copy of this Amended

Complaint is being mailed to the Louisiana Attorney General.

### COUNT FOUR – LOUISIANA UNFAIR TRADE PRACTICES ACT

121.    Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

122.    Upon information and belief, 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National engaged in the unfair and deceptive practices of conspiring and colluding to "poison the well" from which D.H. Griffin sought insurance for the Building demolition.

123.    Due to the magnitude and risk of undertaking the explosive demolition of the unsound, unsafe, partially collapsed Building, only a small number of insurance carriers could underwrite coverage for the Building's explosive demolition.  Many of this small group of insurance carriers were unwilling to underwrite the insurance because they already insured a party involved in the Building construction or in litigation arising out of the collapse.  Some of the remaining carriers were also unwilling to underwrite insurance because they had been approached multiple times, by different parties, to provide coverage for the demolition of the Building and had been provided differing information in the process.

124.    On February 4, 2020, National, through Rich Lafayette and Crawford Global Technical Services, requested that D.H. Griffin allow 1031's insurance broker to search for insurance quotes for the demolition.

125.    On February 5, 2020, D.H. Griffin warned 1031, the City and the State that multiple attempts by different stakeholders to secure insurance coverage for the Building demolition would adversely affect the ability to procure insurance from the small pool of available carriers.

126.    On February 7, 2020, David Griffin, Jr., President of D.H. Griffin, reiterated this

admonition to Rich Lafayette.

127.     Despite D.H. Griffin's warnings, Stephen I. Dwyer, upon information and belief at the direction of 1031 and Mohan Kailas, contacted D.H. Griffin's counsel on February 14 2020, proselytizing that the Memorandum of Understanding required D.H. Griffin to obtain $50 million in insurance and demanding that if D.H. Griffin had not obtained $50 million in "insurance by 5 pm on Tuesday, February 18, then my client, 1031 Development LLC, shall require Griffin to supply the information previously requested [by National, Crawford Global Technical Services, and Rich Lafayette] and now listed below to allow my client's brokers to obtain the necessary insurance."

128.     D.H. Griffin responded the same day that despite the non-binding and unenforceable nature of the Memorandum of Understanding, [and despite 1031's actions "muddying" the insurance pool] it had pursued and continued to pursue $50 million in insurance coverage.  D.H. Griffin noted that it had obtained commitments for $50 million in insurance coverage, until the circumstances changed materially when the State changed its position from offering full indemnity to requiring that its indemnity obligation be covered by the project-specific insurance.  D.H. Griffin continued that the proposed pseudo indemnity by the State "sparked a new round of negotiation with the insurance carriers. The current insurance negotiations are quite sensitive, and, to be blunt, Griffin does not need 1031's broker mucking up the works by making competing inquiries to the same insurers we are trying to engage. Accordingly, 1031's request for information below is denied until such time as we have concluded our negotiations."

129.     Notwithstanding D.H. Griffin's warnings, upon information and belief 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and/or National submitted inquiries concerning insurance coverage for the Building demolition at the

same time that D.H. Griffin was attempting to secure $50 million in insurance coverage for the Building demolition.   The inquiries made by 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and/or National impeded D.H. Griffin in acquiring insurance coverage for the Building demolition, increased the premium cost, and ultimately became one of the rationales 1031 used to coerce the City into agreeing to a conventional demolition of the building.

130.   Upon information and belief, 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National were each aware that their actions in furtherance of seeking such coverage were improper, unfair, and deceptive, would poison the insurance well, would interfere with D.H. Griffin's ability to obtain $50 million in insurance coverage at a reasonable price, and they pursued this course of conduct anyway without telling D.H. Griffin.

131.   Upon information and belief, 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National agreed on pursuing this course of conduct knowing that it would cause loss or inconvenience to D.H. Griffin.  By doing so, 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National sought to prevent D.H. Griffin from undertaking the demolition of the Building so that 1031 could hire Kolb to perform the demolition.

132.   1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National's deceptive silence and suppression of the truth caused loss and inconvenience to D.H. Griffin by causing it to incur costs and expenses associated with negotiations for a binding agreement to demolish the Building, causing it to incur costs and expenses associated with preparing for a potential demolition of the Building, causing it to waste

time and resources on negotiations that 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National knew would not be fruitful and a demolition which 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National knew D.H. Griffin would not be permitted by 1031 to undertake, and causing damage to D.H. Griffin's reputation and goodwill when 1031 attempted to distract from its construction and disaster response failings by blaming D.H. Griffin for 1031's delayed demolition of the Building.  1031's anger about the demolition of two failed tower cranes, and the price for which D.H. Griffin sought to demolish the Building, served as its motivation for causing D.H. Griffin loss and inconvenience, and as motivation for causing its co-conspirators to engage in the unfair and deceptive acts of conspiring with and colluding to poison the insurance well from which D.H. Griffin sought coverage for the Building demolition.

133.    Had 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services and National not unfairly and deceptively conspired to and colluded in poisoning the insurance well for coverage for the Building demolition, 1031 would not have been able to craft insurance-related excuses for why it "moved on" from D.H. Griffin for the Building demolition.

134.    D.H. Griffin suffered damages as a result of 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National's unfair and deceptive practices, including its deceptive silence and suppression of the truth, including, but not limited to, all of its costs and expenses related to negotiation of the Building demolition, the costs of the time spent by D.H. Griffin employees related to negotiation of the Building demolition, all costs and expenses related to preparation for the potential demolition of the Building, including those of its subcontractors preparing for the Building demolition, and the costs of defending 1031's allegations

related to the Memorandum of Understanding and negotiations for demolition of the Building. 1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National are liable *in solido* for all damages suffered by D.H. Griffin, and for D.H. Griffin's attorneys' fees.   1031, Mohan Kailas, Stephen I. Dwyer, Rich Lafayette, Crawford Global Technical Services, and National are liable to D.H. Griffin for interest on these damages.

135.     Contemporaneous with the commencement of this claim, a copy of this Amended Complaint is being mailed to the Louisiana Attorney General.

## COUNT FIVE – LOUISIANA UNFAIR TRADE PRACTICES ACT

136.     Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

137.     1031 engaged in unfair and deceptive practices toward D.H. Griffin, and continues to engage in unfair and deceptive practices toward D.H. Griffin, by misrepresenting and suppressing the truth regarding the Memorandum of Understanding to deceive D.H. Griffin into believing it just consisted of non-binding talking points designed to create a framework for good faith negotiation of a binding Building demolition contract.

138.     At the meeting in which 1031 and D.H. Griffin signed the Memorandum of Understanding, Praveen Kailas presented the Memorandum of Understanding he drafted on behalf of 1031, telling D.H. Griffin and the others present that it was just to provide some talking points so that the parties could get closer to an agreement.  Neither he, nor any other representative of 1031, nor any other attendee of the meeting, said or did anything to indicate the Memorandum of Understanding was a definitive, binding, or enforceable agreement.  1031 unfairly and deceptively misrepresented and suppressed the truth regarding its plans for the Memorandum of Understanding.   Contrary to Praveen Kailas's representations that the Memorandum of

Understanding was just some talking points, 1031 intended to obtain an unfair and unjust advantage and cause D.H. Griffin loss and inconvenience by claiming after the meeting that the provisions in the Memorandum of Understanding were binding requirements which it would use as leverage against D.H. Griffin in further negotiations and in a subsequent attempt to extort money from D.H. Griffin after 1031's bad faith negotiations for demolition of the Building failed. 1031's anger about the demolition of two failed tower cranes served as its motivation for causing D.H. Griffin loss and inconvenience.

139.    Contrary to representations made at the meeting in which the Memorandum of Understanding was executed, 1031 now falsely claims the Memorandum of Understanding is a binding and enforceable contract, not subject to change.  1031 falsely claims in this lawsuit, in other judicial and administrative forums and matters, and in public that D.H. Griffin breached the Memorandum of Understanding by:

- claiming it needed additional funds to obtain the agreed-upon $50 million in insurance coverage;

- claiming it needed substantial additional funds (between $3 million and $3.5 million) to obtain a mere $22 million in coverage;

- asserting it would work for the State of Louisiana, with 1031's role relegated to paying Griffin for its work;

- repeatedly going behind and around 1031 in its discussions with officials from the State and the City; and

- refusing to provide engineering plans to 1031 (or indeed the State or City) to review.

140.    1031 knows its post-meeting representations regarding the Memorandum of Understanding are false, as it engaged in subsequent negotiations for months on the same subject matter, it subsequently characterized the terms for demolition of the Building as a draft contract, it knew the terms for demolition of the Building would require input from and need to be agreed

to by various other stakeholders, including the City, the State, the owners of the property located at 1022 Iberville, Rich Lafayette, Crawford Global Technical Services, National, members of the demolition team, and D.H. Griffin's insurers, it knew the State's potential provision of indemnity and immunity affected D.H. Griffin's participation in the demolition and the manner in which it might participate in the demolition, and it knew specifics about each issue regarding the potential demolition still needed to be determined, including aspects of the insurance coverage and policy.

141.    D.H. Griffin suffered damages as a result of 1031's unfair and deceptive misrepresentations and suppressions of the truth, and is entitled to all damages it has suffered and will suffer as a result.  D.H. Griffin's damages include, but are not limited to, all of its costs and expenses related to negotiation of the Building demolition, the costs of the time spent by D.H. Griffin employees related to negotiation of the Building demolition, all costs and expenses related to preparation for the potential demolition of the Building, including those of its subcontractors preparing for the Building demolition, and the costs of defending 1031's allegations related to the Memorandum of Understanding and negotiations for demolition of the Building.  1031 is liable for all damages suffered by D.H. Griffin, and for D.H. Griffin's attorneys' fees. 1031 is liable to D.H. Griffin for interest on these damages.

142.    Contemporaneous with the commencement of this claim, a copy of this Amended Complaint is being mailed to the Louisiana Attorney General.

## COUNT SIX – DEFAMATION

143.    Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

144.    1031 defamed D.H. Griffin by repeatedly falsely stating in this lawsuit that D.H. Griffin had ulterior motives in determining the two failed tower cranes needed to be imploded

prior to the demolition of the Building.  1031's false and defamatory statements about D.H. Griffin include the following statements in 1031's original Counterclaim, as well as statements to the same effect found in 1031's filings:

> Even more, 1031 Canal learned that Griffin's procedure for the crane implosion was unnecessary: despite Griffin's representations to the contrary, including assertions that alternative methods of demolishing the cranes could turn the cranes into projectiles, the cranes could have been removed as part of a larger implosion or other comprehensive demolition plan for the Building.
>
> In fact, Griffin changed its position (and cast doubt on) on the need for imploding the cranes while planning discussions were ongoing.  When Griffin's business prospects were limited to the crane implosion, Griffin insisted that the cranes needed to be imploded immediately.  When those prospects improved to potentially being named the contractor for the broader demolition, Griffin similarly changed its opinion to state than an immediate, separate crane implosion was unnecessary and that the cranes could be encompassed into the larger demolition with a longer timeframe.  Griffin's inconsistency was pointed out to the City before the cranes were imploded, but the City nonetheless forged ahead.
>
> Ultimately, 1031 Canal concluded that Griffin used its superior knowlegde to take advantage of 1031 Canal and the City's relative lack of sophistication with respect to demolitions—which in turn allowed Griffin to gain a foothold in discussions for the larger contract to demolish the Building.[24]

1031's Amended Answer, Affirmative Defenses, and Counterclaims similarly state:

> Griffin is believed to have originally pressed for demolition of the two tower cranes because it saw an opportunity to make a tremendous amount of money.  Indeed, Griffin's strategy of reaping tremendous, illegitimate profits for itself at the expense of 1031 Canal is a defining characteristic of the entire relationship between Griffin, 1031 Canal, and the City.  When Griffin became aware that it could obtain its sought-after, unwarranted profits from demolishing the entire Building, Griffin backed away from its previous insistence that the tower cranes needed to be demolished immediately and maintained instead that the tower cranes could be included with a larger implosion.  Those initial efforts to backtrack failed because of political and public pressure to remove the cranes immediately, but Griffin nonetheless remained determined to extract as much profit from its work on the Building as possible.[25]

---

[24] ECF 5 at 13, ¶¶ 15-17.

[25] ECF 64 at 20.

These statements are false and defamatory.  1031 accepted and agreed to the following on October 18, 2019 in a legally binding letter agreement with John Bel Edwards, Governor of the State of Louisiana:

> Pursuant to the authority vested in the Office of the Governor by La. Rev. Stat. 29:721 *et seq.*, and in furtherance of the declared State of Emergency on October 18, 2019 as a result of the partial collapse of the hotel construction project located at 1031 Canal Street in New Orleans, Louisiana, and based on the advice of engineers and other professionals on site, I find that the two construction cranes located at 1031 Canal Street pose an imminent threat of collapse and must be taken down immediately.  With the cooperation of 1031 Canal Development, LLC and Citadel Builders, LLC, and conditioned upon their legally binding agreements set forth in this letter, the State of Louisiana engaged a demolition contractor to demolish the two construction cranes in an Emergency Public Works Agreement dates this date (the "Crane Demolition").  Independent of the findings of the State and its Governor, 1031 Canal Development, LLC and Citadel Development, LLC recognize and agree that the cranes must be taken down, and that the Crane Demolition is the most appropriate means of doing so.

> 1031 Canal Development, LLC and Citadel Builders, LLC hereby (1) consent to entry onto the project site by the State's contractors for purposes of carrying out the Crane Demolition; and (2) waive any claims they may have against the State of Louisiana and its contractors, and the City of New Orleans, arising from or in connection with the Crane Demolition.  1031 Canal Development, LLC and Citadel Builders, LLC further agree to defend and indemnify the State of Louisiana and its contractors, and the City of New Orleans, for any liability, responsibility, costs or expenses incurred in connection with any claims threatened or asserted against any of them by any third parties and arising from or in connection with the Crane Demolition, including, without limitation, attorneys' fees and other costs incurred in connection with any such claims.

145.    State of Louisiana Executive Department Proclamation Number 161 JBE 2019, entitled "*STATE OF EMERGENCY-HARD ROCK HOTEL CRANE DEMOLITION*," provides, among other things, that:

> **WHEREAS,** two large cranes continue to threaten to fall onto surrounding buildings, posing an extreme danger to both life and property;

> **WHEREAS,** a tropical system currently in the Gulf of Mexico may bring heavy winds and rain to Orleans Parish as early as Friday, October 18, 2019, requiring immediate action to avert unpredictable damage the weather may pose to life and property;

***

**WHEREAS,** it is urgent that the two damaged cranes from the building collapse be brought down immediately for the safety and welfare of the inhabitants of the affected area.

1031 further admits in its Counterclaim filed in this Court that "both the City of New Orleans and the State of Louisiana were demanding that immediate action be taken with respect to the cranes."[26]

146.    1031 knew and agreed prior to the demolition of the two failed tower cranes that they posed extreme and immediate danger and needed to be demolished immediately.  1031's statements to the contrary that D.H. Griffin had ulterior motives in making the determination that the two failed tower cranes needed to be imploded prior to the demolition of the Building are false and defamatory.  1031's false and defamatory statements are defamatory *per se* as, by their very nature, false and defamatory statements about a business making determinations based on ulterior motives tend to injure the business's reputation, without considering extrinsic facts or circumstances.

147.    1031 has intentionally or negligently engaged in unprivileged publications of these false and defamatory statements to third parties, as it has published them by publicly filing them in the records of this Court.

148.    Falsity, malice, and fault by 1031, to the extent necessary, are presumed for 1031's *per se* defamatory statements about D.H. Griffin.

149.    1031's false and defamatory statements have injured D.H. Griffin's professional reputation, lowering its reputation in New Orleans and Louisiana, and deterring others from associating or dealing with D.H. Griffin for construction and demolition projects.  Injury to D.H. Griffin is presumed as a result of 1031's *per se* defamatory statements.

---

[26] ECF 5 at 12, ¶ 13.

150.     D.H. Griffin is entitled to all damages resulting from 1031's defamation and injury to D.H. Griffin's reputation.

## COUNT SEVEN – DEFAMATION

151.     Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

152.     1031 defamed D.H. Griffin by falsely stating in this lawsuit that D.H. Griffin breached the public trust and is hiding information about the demolition of the two failed tower cranes.   1031's false and defamatory statements about D.H. Griffin include the following statements in its Answer and Motion to Compel:

Answer

- "This is a transparently preemptive suit filed by Griffin that seeks to avoid responsibility for continuing breaches of the public trust and bad-faith negotiating tactics."[27]

Motion to Compel

- "Griffin does not, for obvious reasons, want information related to that crane implosion or its price-gouging to be released for public consumption."[28]

These statements are false and defamatory.  Statements that a business breached the public trust and is hiding information from the public tend to harm the reputation of the business so as to lower the business's reputation in the community, and deter others from associating or dealing with the business, and otherwise expose the business to contempt and ridicule.  1031 made the statements without basis and solely to harm D.H. Griffin's reputation in Louisiana and the construction and demolition communities. 1031's defamatory statements are defamatory *per se* as,

---

[27] ECF 5 at 1.

[28] ECF 53-1 at 4.

by their very nature, false and defamatory statements about a business breaching the public trust and hiding information from the public tend to injure the business's reputation, without considering extrinsic facts or circumstances.

153.    1031 has intentionally or negligently engaged in unprivileged publications of these false and defamatory statements to third parties, as it has published them by publicly filing them in the records of this Court.

154.    Falsity, malice, and fault by 1031, to the extent necessary, are presumed for 1031's *per se* defamatory statements about D.H. Griffin.

155.    1031's false and defamatory statements have injured D.H. Griffin's professional reputation, lowering its reputation in New Orleans and Louisiana, and deterring others from associating or dealing with D.H. Griffin for construction and demolition projects.  Injury to D.H. Griffin is presumed as a result of 1031's *per se* defamatory statements.

156.    D.H. Griffin is entitled to all damages resulting from 1031's defamation and injury to D.H. Griffin's reputation.

## **COUNT EIGHT – DEFAMATION**

157.    Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

158.    1031 and Stephen I. Dwyer defamed D.H. Griffin by repeatedly falsely stating that D.H. Griffin was unable to procure sufficient insurance for the Building demolition.  1031 and Stephen I. Dwyer's false and defamatory statements include the following:

<u>March 25, 2020 Stephen I. Dwyer Email to City of New Orleans</u>

- "Griffin is unable to meet his prior commitments for insurance and is only ably [sic] to produce $22,000,000 (less than half of the required amount) at an additional cost of $3,400,000 (an amount that [National] has refused to pay)."

<u>March 30, 2020 1031 Motion for Approval of Site Demolition, Entry of Evidence Preservation Protocol, and for Expedited Hearing in *Membreno v. 1031 Investments, L.L.C.*</u>

- "Ultimately, after the contractor proposing to implode the building was unable to provide sufficient insurance to account for the risks to surrounding neighbors, 1031 Development contracted with Kolb Grading, LLC . . . ."

<u>April 2, 2020 Administrative Hearing Testimony by Stephen I. Dwyer</u>

MR. DWYER:

Well, on – let's see the date.  I believe it was on March 18 that Mr. Griffin's attorney, Richard Tyler, sent an email to everyone essentially saying we cannot get the insurance that we agreed to get.  He said that he could get another 12 million – he got 10 million.  He said that he could get another 12 million over and above the 10 million, but it would come at a very steep price.

MS. MINCE:

All right.  And if you look at Exhibit 8, is that a copy of the email that Mr. Tyler sent to you and the other parties?

MR. DWYER:

Yes, it is.  I was one of the recipients of that email.

MS. MINCE:

All right.  After counsel or D.H. Griffin advises that they were unable to secure the required insurance, what happened?

MR. DWYER:

Well, there was a meeting and discussions held with Mr. Lafayette representing the builder's risk carrier, and Griffin wanted well in excess of a million dollars, I think maybe as much as $2 million, to get some of that extra insurance. The builder's risk carrier said that they would provide – actually, after much consternation said that they would provide another 730,000 and allow Griffin to add that to his contract.  But apparently that wasn't enough for Griffin because we heard again from Mr. Tyler on March 20, that Mr. Griffin could not obtain the required 50 million dollars of insurance and, in fact, he could only get 22 million dollars of insurance and that was going to cost more than the 730,000 that the builder's risk insurer had just agreed to pay.  And the final amount that he stretched to pay was the new price that Mr. Griffin gave us was 3.4 million dollars in excess of that $730,000 and that was only to allow him to get another 12 million dollars of insurance and bring the total insurance up to 22 million was far less than half of what everybody had agreed.

<u>April 20, 2020 1031 Emergency Motion in *Membreno v. 1031 Investments, L.L.C.*</u>

- ". . . Griffin confirmed to 1031, the City, and the State that it could not fulfill its obligation to obtain $50 million in insurance for its planned implosion."

April 21, 2020 1031 Letter to City of New Orleans About Demolition Permit

- "1031 negotiated in good faith with the City's chosen contractor (D.H. Griffin)—and made numerous concessions during those negotiations—only for D.H. Griffin to reveal at the end of March that it could not fulfill its obligation to obtain the $50 million of liability coverage everyone agreed was needed for an implosion."

These statements are false and defamatory. D.H. Griffin never represented to 1031 or Stephen I. Dwyer that it could not obtain $50 million in insurance coverage. 1031 and Stephen I. Dwyer made these false and defamatory statements with malice toward D.H. Griffin to prevent D.H. Griffin from undertaking the demolition of the Building, as an excuse for its failures in proceeding with demolition of the Building, and in order assist in gaining approval for Kolb to demolish the Building. 1031 and Stephen I. Dwyer received communications from D.H. Griffin's counsel regarding its efforts to procure insurance for the Building demolition, and the communications did not state D.H. Griffin could not obtain $50 million in insurance coverage. 1031 and Stephen I. Dwyer's false and defamatory statements were at least made negligently, as a reasonable participant in the discussions about D.H. Griffin procuring insurance would know D.H. Griffin did not say it could not obtain $50 million in insurance.

159.    1031 and Stephen I. Dwyer have intentionally or negligently engaged in unprivileged publications of these false and defamatory statements to third parties, as they have published them by publicly filing them in the records of the Civil District Court for the Parish of Orleans, sent them to the City of New Orleans, and testified to them in an open administrative hearing.

160.    1031 and Stephen I. Dwyer's false and defamatory statements have injured D.H. Griffin's professional reputation, lowering its reputation in New Orleans and Louisiana, and deterring others from associating or dealing with D.H. Griffin for construction and demolition

projects.  Upon information and belief, because of 1031 and Stephen I. Dwyer's false and defamatory statements, third parties now wrongly believe D.H. Griffin is unable to acquire sufficient insurance for its projects.

161.   D.H. Griffin is entitled to all damages resulting from 1031 and Stephen I. Dwyer's defamation and injury to D.H. Griffin's reputation.

## COUNT NINE – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

162.   Plaintiff incorporates each paragraph of this Amended Complaint as though fully set forth herein.

163.   Mohan Kailas and 1031 tortiously interfered with D.H. Griffin's business relations with the City and State in preventing D.H. Griffin from contracting with the State for the demolition of the Building, and for agreeing with the City about terms to include in D.H. Griffin's contract with the State.  1031 interfered by failing to negotiate with D.H. Griffin in good faith, and Mohan Kailas and 1031 interfered by poisoning the insurance well from which D.H. Griffin sought insurance for the Building demolition, and by speaking and writing falsely about D.H. Griffin.  In actively preventing a contract between D.H. Griffin and 1031, by poisoning the insurance well, and by speaking and writing falsely about D.H. Griffin, Mohan Kailas and 1031 interfered with D.H. Griffin's ability to contract with the State, and to agree with the City about terms to include in D.H. Griffin's contract with the State.

164.   Mohan Kailas and 1031 actually prevented D.H. Griffin from contracting with the State of Louisiana in an Emergency Public Works Agreement for the demolition of the Building, and in agreeing with the City about terms to include in D.H. Griffin's contract with the State.

165.   Mohan Kailas and 1031's anger, spite, and ill will about the demolition of two failed tower cranes and costs of the Building demolition served as its motivation for interfering in

D.H. Griffin's business relations with the City and State for demolition of the Building.  Mohan Kailas and 1031 were not seeking to protect their legitimate interests in preventing D.H. Griffin from contracting with the City and State for demolition of the Building.  Mohan Kailas and 1031 were not seeking to protect any legitimate interest whatsoever.  Mohan Kailas and 1031 knew implosion of the Building was the safest manner in which to perform the demolition, and that D.H. Griffin was a highly recommended and qualified demolition contractor for this type of job.  When they interfered with D.H. Griffin's business relations with the City and State, Mohan Kailas and 1031 ignored their legitimate interest in having D.H. Griffin perform the Building Demolition. Mohan Kailas and 1031 were improperly seeking revenge against D.H. Griffin because they were angry about having less money from their builders risk insurer for reconstruction of the Building as a result of the demolition of the failed tower cranes.  By preventing D.H. Griffin from contracting with the State, and agreeing with the City about certain terms, for demolition of the Building, Mohan Kailas and 1031 employed their actual malice to punish and penalize D.H. Griffin.

166.    D.H. Griffin suffered damages as a result of Mohan Kailas and 1031's interference with its business relations with the State.  D.H. Griffin was unable to perform the demolition of the Building as a result of the interference.  D.H. Griffin is therefore entitled to the profits it would have obtained from demolition of the Building, based on a total price of at least $15,650,000.00. D.H. Griffin similarly incurred costs and expenses for contract negotiations and preparations for demolition of the Building, including those of its subcontractors preparing for the Building demolition.  D.H. Griffin's damages include, but are not limited to, all of its costs and expenses related to negotiation of the Building demolition, and the costs of the time spent by D.H. Griffin employees related to negotiation of the Building demolition.  Mohan Kailas and 1031 are liable

for all damages suffered by D.H. Griffin. Mohan Kailas and 1031 are liable to D.H. Griffin for interest on these damages.

**JURY DEMAND**

167.    D.H. Griffin requests a jury trial.

**PRAYER FOR RELIEF**

168.    Based on the foregoing, a present case in controversy exists between D.H. Griffin and 1031.  As such, D.H. Griffin is seeking a determination of the validity and the enforceability of the Memorandum of Understanding under Louisiana law and 1031's entitlement to claim damages for breach of contract.  D.H. Griffin seeks a declaratory judgment pursuant to 28 U.S.C. § 2201.

169.    Specifically, D.H. Griffin seeks a judgment declaring that the Memorandum of Understanding is unenforceable, invalid, and is not a binding contract under Louisiana Law.

170.    D.H. Griffin also seeks a judgment declaring that 1031 has no entitlement to claim damages for the alleged breach of the Memorandum of Understanding because it is unenforceable, invalid, and is not a binding contract under Louisiana Law.

171.    D.H. Griffin seeks all damages to which it proves it is entitled, including, but not limited to:

a.   all of its costs and expenses related to negotiation of the Hard Rock Building demolition;

b.    the costs of the time spent by all D.H. Griffin employees related to negotiation of the Hard Rock Building demolition;

c. all costs and expenses related to preparation for the potential demolition of the Hard Rock Building, including the costs and expenses of D.H. Griffin's subcontractors incurred in preparing for the Hard Rock Building demolition;

d. the costs of defending 1031's allegations related to the Memorandum of Understanding and negotiations for demolition of the Hard Rock Building;

e. all damages resulting from defamation and injury to D.H. Griffin's reputation; and

f. the profits D.H. Griffin would have obtained from demolition of the Hard Rock Building, based on a total price of at least $15,650,000.00.

172.   D.H. Griffin is entitled to an award of its attorneys' fees.

173.   D.H. Griffin is entitled to pre- and post-judgment interest.

174.   If the Memorandum of Understanding is held to be enforceable, valid, and binding, D.H. Griffin also seeks a judgment that 1031 breached its obligation pursuant to the Memorandum of Understanding to engage in a good faith negotiation of the services described therein within seven days.

175.   If the Memorandum of Understanding is held to be enforceable, valid, and binding, D.H. Griffin is entitled to all damages it suffered and will suffer in the future, whether foreseeable or not, because of 1031's breach of its obligation was in bad faith.  D.H. Griffin's damages include, but are not limited to, all of its costs and expenses related to negotiation of the Hard Rock Building demolition, the costs of the time spent by D.H. Griffin employees related to negotiation of the Hard Rock Building demolition, all costs and expenses related to preparation for the potential demolition of the Hard Rock Building, including those of D.H. Griffin's subcontractors, and the costs of defending 1031's allegations related to the Memorandum of Understanding and

negotiations for demolition of the Hard Rock Building.

176.    D.H. Griffin also prays for recovery of costs and all general and equitable relief.

177.    This Amended Complaint is being filed with full reservation of all rights and claims that D.H. Griffin has or may have in the future, and with the right to assert additional claims and relief in an amended and/or supplemental Complaint.

**WHEREFORE**, Plaintiff, D.H. Griffin Wrecking Company, Inc. prays that this Amended Complaint be granted and that a judgment be issued and entered by this Honorable Court in conformity with Paragraphs 168-177 above.

Respectfully submitted,

RICHARD J. TYLER, T.A. (La Bar No. 1155)
ALLISON B. KINGSMILL (La Bar No. 36532)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, LA 70170
Telephone: (504) 582-8266
Fax: (504) 589-8266
Email: rtyler@joneswalker.com
        akingsmill@joneswalker.com

*s/ F. Gibbons Addison*
F. Gibbons Addison (La. Bar No. 35426)
Jones Walker LLP
445 North Blvd., Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2000
Fax: (225) 248-3160
Email: gaddison@joneswalker.com
*Counsel for D. H. Griffin Wrecking Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of July, 2020, I filed the foregoing pleading via the court's CM/ECF system, through which this pleading has been served upon counsel of record.

*s/ F. Gibbons Addison*

{N4041819.2}                                46